**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**February 6, 2018**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

CITIZEN POTAWATOMI NATION,

Plaintiff - Appellee,

v.

STATE OF OKLAHOMA,

Defendant - Appellant.

No. 16-6224

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**
**(D.C. NO. 5:16-CV-00361-C)**

---

Mithun Mansinghani, Assistant Solicitor General (Patrick R. Wyrick, Solicitor General, and Jared B. Haines, Assistant Solicitor General, on the briefs), Oklahoma Office of the Attorney General, Oklahoma City, Oklahoma, for Defendant-Appellant.

Gregory M. Quinlan, Citizen Potawatomi Nation, Shawnee, Oklahoma, for Plaintiff-Appellee.

---

Before **TYMKOVICH**, Chief Judge, **BRISCOE**, and **MURPHY**, Circuit Judges.

---

**MURPHY**, Circuit Judge.

---

## I. INTRODUCTION

Oklahoma and the Citizen Potawatomi Nation (the "Nation") entered into a Tribal-State gaming compact (the "Compact"). *See* 25 U.S.C. § 2710(d)(3) (providing for such compacts). Part 12 of the Compact contains a dispute-resolution procedure that calls for arbitration of disagreements "arising under" the Compact's provisions. It also indicates that either party may, "[n]otwithstanding any provision of law," "bring an action against the other in a federal district court for the de novo review of any arbitration award." In *Hall Street Associates, LLC. v. Mattel, Inc.*, however, the Supreme Court held that the Federal Arbitration Act ("FAA") precludes parties to an arbitration agreement from contracting for de novo review of the legal determinations in an arbitration award. 552 U.S. 576, 583-84 (2008). Instead, according to the Court, 9 U.S.C. §§ 10 and 11 provide the exclusive grounds for a court to vacate or modify an arbitration award. *Id.*

This court must resolve how to treat the Compact's de novo review provision given the Supreme Court's decision in *Hall Street Associates*. The Nation asserts the appropriate course is to excise from the Compact the de novo review provision, leaving intact the parties' binding obligation to engage in arbitration, subject only to limited judicial review under 9 U.S.C. §§ 9 and 10. This is the approach adopted, sub silentio, by the district court. Oklahoma, in contrast, asserts the de novo review provision is integral to the parties' agreement

to arbitrate disputes arising under the Compact and, therefore, this court should sever the entire arbitration provision from the Compact.

The language of the Compact demonstrates that the de novo review provision is a material aspect of the parties' agreement to arbitrate disputes arising thereunder. Because *Hall Street Associates* clearly indicates the Compact's de novo review provision is legally invalid, and because the obligation to arbitrate is contingent on the availability of de novo review, we conclude the obligation to arbitrate set out in Compact Part 12 is unenforceable. Thus, exercising jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1362, this matter is **remanded** to the district court to enter an order **vacating** the arbitration award.

## II. BACKGROUND

### A. The Compact

The Nation's Chairman signed the Compact on November 30, 2004. *See* Okla. Stat. tit. 3A, §§ 280-281 (offering "a model tribal gaming compact" to federally recognized tribes within Oklahoma's borders and providing that a compact would take effect through the "signature of the chief executive officer of the tribal government," with "[n]o further action by the Governor or the state" required). The Compact was deemed approved and in effect as of February 9, 2005. *See* Notice of Class III Gaming Compacts Taking Effect, 70 Fed. Reg. 6903-01 (Feb. 9, 2005); *see also* 25 U.S.C. § 2710(d)(8)(C) (allowing a Tribal-

State gaming compact to be deemed approved if not acted on by the Secretary of the Interior within forty-five days after the Compact's submission).

The Compact opens with a series of recitals, specifically noting the sovereign nature of the parties, the need for respectful government-to-government relations, and the "long recognized . . . right" of the Nation to govern tribal lands. It then sets forth a comprehensive structure regarding Class III gaming on the Nation's lands and describes the parties' rights and responsibilities with regard to that gaming. The Compact applies to "[f]acilit[ies]," which are defined as "any building of the tribe in which the covered games authorized by this Compact are conducted." The Nation has two such facilities, the FireLake Grand Casino and the FireLake Entertainment Center. Particularly important for understanding the underlying arbitration proceedings that lead to this appeal, Part 5(I) of the Compact provides that the "sale and service of alcoholic beverages in a facility shall be in compliance with state, federal, [and] tribal law in regard to the licensing and sale of such beverages." The Compact contains the following dispute resolution procedure:

> In the event that either party to this Compact believes that the other party has failed to comply with any requirement of this Compact, or in the event of any dispute hereunder, including, but not limited to, a dispute over the proper interpretation of the terms and conditions of this Compact, the following procedures may be invoked:
>
> . . . ;

2. Subject to the limitation set forth in paragraph 3 of this Part, either party may refer a dispute arising under this Compact to arbitration under the rules of the American Arbitration Association (AAA), subject to enforcement or pursuant to review as provided by paragraph 3 of this Part by a federal district court. The remedies available through arbitration are limited to enforcement of the provisions of this Compact. The parties consent to the jurisdiction of such arbitration forum and court for such limited purposes and no other, and each waives immunity with respect thereto. . . .

. . . ; and

3. Notwithstanding any provision of law, either party to the Compact may bring an action against the other in a federal district court for the de novo review of any arbitration award under paragraph 2 of this Part. The decision of the court shall be subject to appeal. Each of the parties hereto waives immunity and consents to suit therein for such limited purposes, and agrees not to raise the Eleventh Amendment to the United States Constitution or comparable defense to the validity of such waiver.

*See* Okla. Stat. tit. 3A, § 281.

## B.  The Underlying Dispute and Arbitration Proceedings

The dispute underlying the arbitration award and this appeal began with administrative proceedings before Oklahoma's alcohol (the Alcoholic Beverage Laws Enforcement Commission ("ABLE")) and sales tax (the Oklahoma Tax Commission ("OTC")) regulators. ABLE began proceedings against the Nation on the ground the Grand Casino was selling alcoholic beverages on Sundays, in violation of Okla. Stat. tit. 37, § 591.[1] ABLE has authority to refuse to renew,

---

[1]Oklahoma utilizes a "county option" for sales of liquor by the drink. Such sales are prohibited unless authorized by the county's voters and, even if such

(continued...)

suspend, or revoke licenses if the license holder fails to comply with license

requirements.  Okla. Stat. tit. 37, §§ 527.1, 528.

While ABLE proceedings were ongoing, the OTC sent a request to the

Nation as the holder of Oklahoma licenses and permits.  According to the OTC:

> 4.  As the holder of Sales Tax Permits, [the Nation] is required to report and remit sales tax due on transactions subject to Oklahoma Sales Tax . . . .  [The Nation] has filed Oklahoma Sales Tax Returns on a semi-annual basis, commencing January 18, 2011 . . . .
>
> 5. . . .  [E]ach return filed by [the Nation] reported total sales and claimed exemptions in the exact amount of total sales, reporting a "zero" sales tax liability.
>
> 6.  Pursuant to [OTC regulations], all gross receipts are presumed subject to tax, until shown to be tax exempt.  The burden of proving that a sale is an exempt sale is on the vendor.
>
> 7.  [The Nation's] returns . . . , while  claiming exemptions in the exact total amount of reported sales, fail to identify, much less establish that all sales were exempt.

In Oklahoma, businesses selling alcoholic beverages by the drink must obtain

both an appropriate liquor license from ABLE and a matching tax permit from the

OTC.  Okla. Stat. tit. 37, §§ 163.7, 577.  The OTC is empowered to revoke all of

---

[1](...continued)
sales are authorized, county voters have the choice to restrict sales on certain days.  Okla. Const. art. XXVIII, §§ 4, 6; Okla. Stat. tit. 37, § 591.  When the voters of Pottawatomie County approved the sale of alcoholic beverages by the drink, they provided that such sales are not authorized on Sundays.

a licensee's tax permits and licenses upon a violation of state tax law. *Id.* tit. 68, § 212(A)(2).[2]

In the ABLE proceedings, the Nation claimed it did not have to submit to the prohibition on Sunday sales because that prohibition flowed from a county rule, not state law. It also asserted arbitration pursuant to Compact Part 12 was the only proper forum for resolving licensing disputes. An administrative law judge recommended that ABLE reject the Nation's first argument because (1) the county option as to sales of liquor by the drink flowed directly from state law and the Oklahoma Constitution and (2) the Nation had applied for and received state-granted liquor licenses, and federal law establishes that states have jurisdiction over liquor sales in "Indian Country."[3] The administrative law judge also reasoned that the overall structure of the Compact demonstrated the parties did not agree to resolve licensing disputes via the mechanism set out in Compact Part 12.

---

[2]The record reveals, however, that for years OTC representatives requested the Nation to submit periodic reports for sales of goods by tribal businesses on tribal lands, with the express agreement and assurance (1) the purpose of the request was to facilitate administrative convenience to the Tax Commission and (2) the Nation should report its sales tax collections as "0." This historic approach was consistent with the Nation's practice of never collecting Oklahoma sales tax on sales to non-tribal members. The instant OTC proceedings were the first and only time Oklahoma has taken any enforcement action against a tribe on the basis Oklahoma sales taxes apply to all sales by a tribe to non-tribal members.

[3]Oklahoma is entitled to regulate and license tribal liquor transactions. *Rice v. Rehner*, 463 U.S. 713, 723-724 (1983); *Citizen Band Potawatomi Indian Tribe of Okla. v. Okla. Tax Comm'n*, 975 F.3d 1459, 1461-62 (10th Cir. 1992).

The administrative law judge issued his decision in the middle of the Nation's briefing schedule at the OTC. The Nation then invoked the Compact's arbitration provision and made Compact Part 5(I) central to its arbitration theory.[4] According to the Nation, disputes involving alcohol sales and licensing that might impact its gaming businesses were subject to arbitration under the Compact.[5] In

[4]While the arbitration progressed, administrative proceedings at the OTC continued. OTC staff and the Nation engaged in briefing separately from the arbitration, after which the OTC concluded the Nation had applied for a state alcohol license and, therefore, had to comply with the attendant obligations such as responding to an audit request. The OTC rejected the Nation's argument that the issue before it was a gaming dispute due to the possibility the OTC's actions might affect the Nation's liquor sales at its gaming facilities. The OTC eventually revoked the Nation's sales tax permits and liquor licenses for failure to comply with Oklahoma law. The Nation's appeal to the Oklahoma Supreme Court is currently stayed pending the instant litigation over the arbitration award.

[5]The Nation's Demand for Arbitration specifically sought a determination "whether the Dispute Resolution (including arbitration) procedures of the Compact are the exclusive means by which Oklahoma may seek to enforce against the Nation's Compact facilities the Nation's duties imposed to comply with state laws governing sales and service of alcoholic beverages." According to the Nation:

> Part 12 of the Compact provides unambiguous Dispute Resolution procedures in the event of a dispute. The preamble to Part 12 reads, in its entirety,

> > In the event that either party to this Compact believes that the other party has failed to comply with any requirement of this Compact, or in the event of any dispute hereunder, including, but not limited to, a dispute over the proper interpretation of the terms and conditions of this Compact, the following procedures may be invoked.

(continued...)

response, Oklahoma disputed the Nation's assertion arbitration was the proper forum for determining disputes that arise because of the Nation's failure to comply with laws and regulations governing sales tax and liquor licenses.[6] Ultimately, for that very reason, Oklahoma filed a motion to dismiss the Nation's demand for arbitration, arguing regulatory disputes between the parties must be resolved through administrative proceedings, not arbitration. The arbitrator refused to dismiss the Nation's arbitration demand, reasoning that the Nation's theory (i.e., that Part 12 of the Compact was the exclusive means of enforcing the Nation's obligations under Part 5(I)) was substantively arbitrable.[7]

---

[5](...continued)
Any violation of any term of the Compact or disagreement about the scope or interpretation of the Compact engages Part 12.

Finally, the Nation asserted the parties' dispute over liquor licenses and/or permits arose under the Compact: "The Compact expressly covers a Compact facility's duties with respect to sale and service of alcoholic beverages. Part 5(I) states: 'The sale and service of alcoholic beverages in a facility shall be in compliance with state, federal and tribal law in regard to the licensing and sale of such beverages.'"

[6]In its first response to the Nation's demand for arbitration, Oklahoma filed an "Answering Statement." In that answer, Oklahoma repeatedly denied "that the administrative actions brought by ABLE and OTC arise from any rights, duties, or obligations of either [the Nation] or [Oklahoma] under the Compact." Instead, according to Oklahoma, "both administrative actions are based upon the duties and obligations imposed upon [the Nation] by the various permits and licenses at issue in those proceedings." For that reason, Oklahoma asserted the licensing disputes were not arbitrable.

[7]Oklahoma also filed a motion for summary judgment. In that motion, Oklahoma argued the Compact does not subsume every licensing issue that arises
(continued...)

-9-

The arbitrator conducted a hearing. The Nation's Vice-Chairman, Linda Capps, and Tribal Counsel, Gregory Quinlan, testified as to the history of the interaction between the OTC and the Nation. As to the parties' intended meaning of the Compact, the Nation presented the testimony of Oklahoma's ex-Governor, Brad Henry, and the Nation's Chairman, John A. Barrett. Governor Henry testified he directed and oversaw the model gaming compact negotiations. He testified the Compact provided for arbitration: (1) to resolve disputes more quickly and with less expense; and (2) to maintain each party's sovereignty by preventing Oklahoma from attempting to pull Native American tribes into state court to resolve claims. Governor Henry testified the Compact was authored by

---

[7](...continued)
between the Nation and the State's administrative licensing bodies. Oklahoma also asserted it has preexisting authority to regulate liquor transactions in Indian Country under federal statutory law and binding United States Supreme Court precedent. Thus, Oklahoma argued, Part 5 of the Compact does not alter the parties' jurisdiction regarding alcohol sales but, instead, conditions the availability of gaming on compliance with Oklahoma's preexisting authority. The arbitrator refused to grant Oklahoma summary judgment, concluding as follows:

> The underlying dispute centers primarily on the Nation's contention that they have no obligation to accede to the State's demand for all of the Nation's businesses to collect, report and remit sales taxes on sales to non tribal members. The Nation's claim is *arbitrable*. The arbitration agreement in question is extremely broad. It is governed by the Federal Arbitration Act which embodies a strong presumption that an arbitration clause applies and resolves any doubt arising from the contract language to favor arbitration.

The arbitration then progressed through discovery and an evidentiary hearing.

the state and offered to the Nation as a "take it or leave it" proposition. He

further testified the Compact was not intended to subject the Nation to the

taxation urged by Oklahoma.[8]

As to economic aspects of a federal preemption analysis,[9] the Nation

presented the testimony of, inter alia, Dr. Joseph P. Kalt, Professor Emeritus at

the John F. Kennedy School of Government at Harvard University. Dr. Kalt

testified there is an explicit federal policy regarding Native American

self-determination and that:

> [T]he federal government has been on a quite consistent path in
> which it is seeking to fulfill its trust responsibilities to tribes by
> letting the tribes hold the reins of self-government in order to
> hopefully make better decisions and begin to move tribes, both
> culturally and economically, politically forward under their own
> decision-making as tribal nations under self-rules of self-governance.

As to the Nation's provision of governmental functions and services, Dr. Kalt

testified that: "[The Nation] is extremely well-known, actually, for its going well

beyond its provision of services and performance of governmental functions than

---

[8]Governor Henry testified Compact Part 5(I) was intended to ensure minors had no access to alcohol, not as leverage to enforce other laws outside of the Compact. He explained model-compact negotiations were delicate and Oklahoma's primary goal was to obtain a portion of tribal gaming revenues to supplement funding for education. According to Governor Henry, "the last thing (the State) would have wanted to do, in my opinion, is try to backdoor in some language to require these Tribes that we're trying to get a deal with, to pay other taxes that they weren't paying."

[9]This preemption analysis is derived from the Supreme Court's decision in *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136 (1980).

what would have been allowed by just the level of federal funding." Dr. Kalt testified that given the Nation's millions of dollars of payments in Compact exclusivity fees and mixed beverage taxes, the incremental burdens on Oklahoma caused by the Nation's economy were not uncompensated, stating:

> [T]he State of Oklahoma does not have any uncompensated burden. In fact, it's benefitting from a wealthy neighbor, or getting wealthier neighbor, that is producing its own GDP now, the [Nation], that benefits the State of Oklahoma. And there's no evidence that I can find that indicates that the State is suffering some uncompensated burden as a result of the Tribe's success in developing its own economy . . . .

> Two hundred and fifty million dollars spending by the [Nation] will generate five hundred million dollars, a little more than five hundred million dollars, of economic activity overall in the region. Well, that level of economic activity will far outweigh any uncompensated burden that we could imagine. It's implausible to imagine that there's, you know, a quarter of a billion or half a billion dollars' worth of uncompensated burden.

Oklahoma's only witness was former gubernatorial General Counsel, Steve Mullins. He maintained Oklahoma could attach any condition whatsoever, including taxation of activities unrelated to the sale of alcoholic beverages, to the Nation's alcoholic beverage sales license. Mullins testified he did not believe Oklahoma was seeking to compel the Nation to pay taxes, but that it sought to compel the Nation to file tax reports as a condition of maintaining alcoholic beverage permits at the facilities covered by the Compact. Oklahoma offered no testimony or other evidence material to a  preemption analysis derived from *White*

-12-

*Mountain Apache Tribe v. Bracker*, 448 U.S. 136 (1980), or to the parties'

intended meaning of the Compact terms at issue.

The arbitrator issued an award in favor of the Nation. The award began by

reiterating that the dispute between Oklahoma and the Nation was arbitrable. The

arbitration award went on to declare that, under the test set out in *Bracker*, federal

law preempts Oklahoma's ability to levy a tax on sales made within tribal

jurisdiction by the nation to individuals that are not members of the Nation.[10]

_____

[10]The arbitration award simply provides as follows:

> The Nation contends that even if the State's Sales Tax Code
> purported to apply to the Nation's sales of goods and services to
> nontribal members, it would be preempted under the federal
> balancing test applied in *Indian Country, U.S.A. v. State of
> Oklahoma*, 829 F.2d 967 (10th Cir. 1987) and *White Mountain
> Apache Tribe v Bracker*, 448 U.S. 136 (1980) . . . . [W]hen the legal
> incidence of a tax falls on non-Indians, as it does here, no categorical
> bar prevents enforcement of the tax. Federal and tribal interests must
> be weighed against state interests. At the hearing, the Nation
> established (i) significant federal and tribal interests in the Nation's
> self-governance, economic self-sufficiency, and self-determination;
> (ii) the Nation alone invests value in the goods and services that it
> sells, does not derive such value through an exemption from State
> sales taxes, and imposes its own equivalent tribal sales tax on the
> sales; (iii) the State possesses no economic interest beyond a general
> quest for additional revenue in imposing a sales tax on the Nation's
> transactions and suffers no uncompensated economic burden arising
> therefrom; and (iv) the federal and tribal interests at stake
> predominate significantly over any possible State interest in the
> transactions upon which the State seeks to impose its sales tax.
> Accordingly, federal law protecting tribal sovereignty interests
> preempts and invalidates the State's sales tax on the Nation's sales in
> question. . . .

Finally, the award enjoined Oklahoma from (1) taking any action to divest Compact facilities of the right to sell and serve alcoholic beverages or (2) "threaten[ing] other enforcement actions" against the Nation on the ground the Nation does not comply with Oklahoma's sales tax laws.

## C.  Confirmation Proceedings in the Federal District Court

The Nation moved to enforce the arbitration award by filing an action in the United States District Court for the Western District of Oklahoma.  9 U.S.C. § 9.  It argued that, pursuant to the extraordinarily narrow review provisions set out in 9 U.S.C. § 10, the arbitrator properly determined the dispute was arbitrable and correctly concluded the Nation has no legal duty to report, collect, or remit the state sales taxes at issue in the state administrative proceedings.  Oklahoma filed a motion to vacate the arbitration award.  *Id.* § 10(a)(4).  It asserted it was entitled to have the award vacated because the arbitrator (1) exceeded his powers by failing to limit the award to enforcement of the Compact's provisions[11] and (2) "so imperfectly executed [his powers] that a mutual, final, and definite award upon the subject matter submitted was not made."[12]  *See id.*  In any event,

---

[11]Oklahoma claimed the arbitrator failed to interpret and enforce the Compact.  Instead, according to Oklahoma, the arbitrator opted to make public policy by invalidating Oklahoma's sales tax laws as they relate to Compact gaming facilities and conferring upon the Nation a right to sell and serve alcohol that does not exist in the law and is not created by the Compact.

[12]Oklahoma claimed the award was so indefinite or ambiguous that enforcement of the award was problematic and failed to resolve all issues

(continued...)

-14-

Oklahoma asserted it was entitled to de novo federal court adjudication of the factual and legal issues involved in the arbitration.

After the parties engaged in further briefing, the district court entered an order enforcing the arbitration award. The district court began its analysis by recognizing that review of arbitration awards is among the narrowest known to the law. *Cf. Litvak Packing Co. v. United Food & Commercial Workers, Local Union No. 7*, 886 F.2d 275, 276 (10th Cir. 1989). With that standard in mind, the district court concluded the arbitrator's determination—that Oklahoma could not force the Nation to collect, record, or remit sales taxes for transactions on tribal lands involving individuals who are not members of the Nation—at least arguably drew its essence from the Compact. The district court also rejected Oklahoma's assertion the arbitrator recognized a right to serve alcoholic beverages that is not conferred by the Compact. According to the district court, "it is clear that the arbitrator was not suggesting or implying that some unfettered right exists to sell alcohol. Rather, it is clear from that surrounding language in the portions of the award where the term 'right' is used, that the arbitrator's intent was simply a manner of expressing the [Nation's] entitlement to sell alcohol without improper enforcement actions against it by [Oklahoma]." As to Oklahoma's asserted entitlement to de novo review, the district court concluded as follows:

---

[12](...continued)
submitted for arbitration.

> [Oklahoma] requests that the Court conduct de novo review of the award, relying upon Part 12(3) of the Compact. As [the Nation] notes, [Oklahoma's] argument in this regard is foreclosed by the Supreme Court's ruling in *Hall Street Assocs*. . . . There, the Supreme Court noted that the parties may not expand the grounds of review of an award beyond those set forth by the . . . [FAA]. . . . The Supreme Court made clear that the only grounds for vacating or modifying an arbitration award were those set forth in §§ 10 or 11 of the FAA. As [the Nation] notes, to engage in de novo review as requested by [Oklahoma] would improperly broaden the permissible grounds for setting aside the award. Thus, [Oklahoma's] argument is foreclosed by Supreme Court precedent.

The district court's decision does not contain a discussion of Oklahoma's properly raised assertion that the arbitration provision of Compact Part 12 was invalid if the de novo review provision was rendered unenforceable by *Hall Street Associates*.

## III. ANALYSIS

On appeal, Oklahoma challenges, on two independent bases, the order of the district court confirming the arbitration award. Oklahoma asserts the district court erred in confirming the award because the award did not finally resolve all submitted issues, suffers from fatal vagueness, and exceeds the arbitrator's powers. *See* 9 U.S.C. § 10(a)(4). Oklahoma also asserts the district court erred in failing to conduct de novo review of the merits of the parties' dispute, as contemplated by Compact Part 12(3). And, if such de novo review is unavailable, Oklahoma asserts the district court erred in failing to sever the obligation to

-16-

engage in binding arbitration from the Compact, as de novo review was a material aspect of the parties' agreement to arbitrate disputes arising under the Compact.

Prudential concerns counsel in favor of resolving Oklahoma's appeal by reference to the validity of the Compact's requirement to engage in binding arbitration. As set out below, the decision in *Hall Street Associates* leaves no doubt that an attempt to alter the review standards set out in the FAA is legally invalid. Furthermore, the text of the Compact demonstrates the materiality of Part 12(3) to the parties' agreement to engage in binding arbitration, leaving resolution of the appeal straight forward and providing Oklahoma with all the relief sought. Addressing this issue also has the salutary effect of resolving legal uncertainty. Oklahoma has entered into gaming compacts with many tribes, https://www.bia.gov/as-ia/oig/gaming-compacts (last visited Jan. 9, 2018). Because those compacts are all derived from Oklahoma's "model tribal gaming compact," Okla. Stat. tit. 3A, § 281, resolving the issue of the validity of Compact Part 12's arbitration provision will allow the parties to those compacts to develop roadmaps for how to proceed when gaming-related disputes arise between Oklahoma and a tribe with a compact.

On the other hand, beginning the analysis with an FAA § 10(a)(4) merits review of the arbitrator's award is not particularly productive. It is uncertain, although we do not offer any definitive resolution of the question, whether Oklahoma could obtain all the relief it seeks under the limited review of an

-17-

arbitration award set out in § 10(a)(4). That being the case, this court would likely need to resolve the validity of the Compact's arbitration provision anyway. *See* Oklahoma's Reply Brief at 2 ("The critical issue raised by this appeal is whether the district court was correct in holding that the parties are bound by an arbitration agreement that has been fundamentally altered by a Supreme Court decision that rendered one of its material terms unenforceable."). Nor does it seem proper, given the Supreme Court's decision in *Hall Street Associates*, to engage in some type of shadow de novo review to determine whether Oklahoma would prevail even were this court to apply the review advocated for by Oklahoma on appeal. In any event, even if this court were inclined to engage in such a review, it is not clear we are properly equipped for such a task. In its motion to vacate the arbitration award in the district court, Oklahoma asserted the de novo review provision entitled it to de novo review of the arbitrator's factual findings and legal determinations.[13] On appeal, however, neither party has briefed whether the Compact's de novo review provision only applies to the arbitrator's legal conclusions or to both legal conclusions and factual findings. And, if Oklahoma is correct that the Compact requires de novo review of the

---

[13]For an example of what such a system of de novo review might resemble, *see generally United States v. Raddatz*, 447 U.S. 667 (1980) (describing district court review of recommendations made by magistrate judges under the provisions of 28 U.S.C. § 636(b)(1)(B)).

arbitrator's factual findings, such a task would necessarily have to occur in the district court.[14]

For all of the reasons set out above, the prudent course is for this court to resolve this appeal by reference to Oklahoma's argument that Compact Part 12(3)'s de novo review provision is a material aspect of Part 12's requirement that the parties engage in binding arbitration and, assuming the legal invalidity of that provision, the arbitration provision must be severed from the Compact.

## A. Compact Part 12(3)'s De Novo Review Provision is Legally Invalid

This court can quickly dispose of Oklahoma's argument that even given the Supreme Court's decision in *Hall Street Associates*, the de novo review provision in Compact Part 12(3) is still valid and enforceable. Oklahoma concedes *Hall Street Associates* held that parties to an arbitration agreement cannot contract for any review other than the narrow review set out in 9 U.S.C. §§ 10 and 11.[15] It

---

[14]Compact Part 12(3) provides as follows: "Notwithstanding any provision of law, either party to the Compact may bring an action against the other in a federal district court for the de novo review of any arbitration award under paragraph 2 of this Part. The decision of the court shall be subject to appeal." Okla. Stat. tit. 3A, § 281.

[15]*Hall Street Associates* provides as follows:

> The [FAA] . . . supplies mechanisms for enforcing arbitration awards: a judicial decree confirming an award, an order vacating it, or an order modifying or correcting it. [9 U.S.C. §§ 9–11]. An application for any of these orders will get streamlined treatment as a motion, obviating the separate contract action that would usually be necessary to enforce or tinker with an arbitral award in court. [*Id.*
> (continued...)

-19-

argues, however, that "the policies behind the Indian Gaming Regulatory Act [("IGRA")] have substantially more importance than the policies behind the Federal Arbitration Act."  Oklahoma's Opening Br. at 42.  *But see Hall Street Assocs.*, 552 U.S. at 588 ("[I]t makes more sense to see [9 U.S.C. §§ 9-11] as substantiating a national policy favoring arbitration with just the limited review needed to maintain arbitration's essential virtue of resolving disputes straightaway.  Any other reading opens the door to the full-bore legal and evidentiary appeals that can render informal arbitration merely a prelude to a more cumbersome and time-consuming judicial review process, and bring arbitration theory to grief in post arbitration process." (citation, quotation, and alteration omitted)).  Oklahoma goes on to argue that IGRA favors federal court litigation to resolve disputes between sovereign Indian tribes and sovereign states.

------

[15](...continued)
§ 6].  Under the terms of § 9, a court 'must' confirm an arbitration award 'unless' it is vacated, modified, or corrected 'as prescribed' in §§ 10 and 11.  Section 10 lists grounds for vacating an award, while § 11 names those for modifying or correcting one.

. . . .  We now hold that §§ 10 and 11 respectively provide the FAA's exclusive grounds for expedited vacatur and modification.

552 U.S. at 582-84 (footnote omitted).  To be clear, both the Nation's motion to confirm the arbitration award and Oklahoma's motion to vacate that award were predicated on the provisions of the FAA.  *See id.* at 590 (noting that the holding applies only to motions to confirm or vacate an award under the FAA and declining to consider whether a party to an arbitration agreement can obtain "more searching review" "under state statutory or common law").

-20-

Apparently, Oklahoma infers from this supposed IGRA "policy" in favor of federal court litigation, a parallel, though unstated, IGRA preference for de novo review in federal court of arbitration awards flowing from Compact-based arbitration agreements. Finally, Oklahoma notes a gaming compact must be approved or deemed approved by the Secretary of the Interior before it can go in to effect, 25 U.S.C. § 2710(d)(1)(C), and that the Compact was deemed approved. Notice of Class III Gaming Compacts Taking Effect, 70 Fed. Reg. 6903-01 (Feb. 9, 2005). From all this, Oklahoma argues Compact Part 12(3) survives the Supreme Court's decision in *Hall Street Associates*. Oklahoma's Opening Br. at 43-44 ("Given [IGRA's] reliance on federal court litigation to resolve disputes between states and tribes, it is unsurprising that the Bureau of Indian Affairs has not objected to the de novo review clause in Oklahoma's state-tribal gaming compacts. Preventing federal court review under the [FAA] would actually undermine [IGRA's] reliance on federal courts to protect tribal and state interests." (footnote omitted)).

Oklahoma's arguments in support of the application of de novo review are unconvincing. It does not provide a single citation to authority in support of its contention that the policies underlying IGRA are more important than the policies underlying the FAA. Nor has this court found any such authorities. Furthermore, although it is true that IGRA provides a federal forum to litigate and vindicate interests related to gaming and gaming compacts, 25 U.S.C. § 2710(d)(7)(A),

arbitration is not mentioned in IGRA and no provision of IGRA purports to alter

the FAA review provisions. Given that *Hall Street Associates* makes clear de

novo review is entirely incompatible with the expedited process envisioned in the

FAA, 552 U.S. at 588, this court is unwilling to treat the mere provision of a

federal forum in IGRA as some implicit rejection of the applicability of the FAA

review standards to arbitrations involving gaming compacts. After all, IGRA

neither encourages nor discourages the inclusion of arbitration provisions in

gaming compacts, leaving the matter entirely to the parties entering into such a

compact.[16] *See Michigan v. Bay Mills Indian Cmty.*, 134 S. Ct. 2024, 2035 (2014)

(noting the parties had agreed to arbitrate disputes related to the gaming compact,

---

[16]To the extent Oklahoma's brief could be read as asserting this court
should enforce its right to de novo review because the liberal policy in favor of
arbitration is based on freedom of contract, that argument was specifically
rejected by the Court in *Hall Street Associates*:

> Hall Street says that the agreement to review for legal error
> ought to prevail simply because arbitration is a creature of contract,
> and the FAA is motivated, first and foremost, by a congressional
> desire to enforce agreements into which parties have entered. But,
> again, we think the argument comes up short. Hall Street is certainly
> right that the FAA lets parties tailor some, even many, features of
> arbitration by contract, including the way arbitrators are chosen,
> what their qualifications should be, which issues are arbitrable, along
> with procedure and choice of substantive law. But to rest this case
> on the general policy of treating arbitration agreements as
> enforceable as such would be to beg the question, which is whether
> the FAA has textual features at odds with enforcing a contract to
> expand judicial review following the arbitration.

552 U.S. at 585-86 (quotation, alteration, and citations omitted).

but specifically recognizing IGRA gave Michigan the leverage necessary to obtain from the tribe a waiver of sovereign immunity so that such disputes would be dealt with in litigation). Finally, Oklahoma has not identified, and this court has not found, any support for the notion it is entitled to have the de novo review provision of the arbitration agreement enforced because the Secretary of the Interior deemed the compact approved pursuant to 25 U.S.C. § 2710(d)(3)(B), (d)(8). Although the Secretary is obligated to reject any gaming compact that "violates . . . any other provision of Federal law," *id.* § 2710(d)(8)(B)(ii), in so doing, the Secretary is not empowered to unilaterally alter the provisions of the FAA (or, for that matter, the provisions of any other federal statute). *See Pueblo of Santa Ana v. Kelly*, 104 F.3d 1546, 1557 (10th Cir. 1997) (rejecting contention that Secretary of the Interior can, by simple act of approving gaming compacts, "ratify or authorize" otherwise unauthorized conduct).

Because *Hall Street Associates* makes clear the de novo review provision set out in Compact Part 12(3) is legally invalid, this court must turn to the question whether that provision is a material aspect of the parties' agreement to engage in binding arbitration.

**B. Materiality of Compact Part 12(3) to the Parties' Agreement to Arbitrate**

### 1. *Hall Street Associates*

Before turning to the language of the Compact and, at least potentially, the record evidence regarding the intent of the parties, it is necessary to resolve a

predicate assertion on the part of the Nation. The Nation's brief on appeal could be read to suggest the decision in *Hall Street Associates* forecloses the relief sought by Oklahoma. *See* The Nation's Br. at 23 ("The *Hall Street* Court did not find that the infirm standard of review provision worked to invalidate the entire arbitration clause at issue in that matter. The District Court correctly found that the invalidity of the non-FAA standard of review provision likewise does not work to invalidate any other portion of the Compact." (footnote omitted)). In so arguing, the Nation fails to recognize that the Court in *Hall Street Associates* made clear it was not passing on the question whether severability of the obligation to engage in binding arbitration was an appropriate response to the invalidity of a de novo review provision. 552 U.S. at 587 n.6 (noting the Ninth Circuit ruled against Hall Street Associates on the issue of severability and Hall Street Associates did not seek certiorari on the issue, so the issue was not before the Court); *see also Hall Street Assocs., LLC v. Mattel Inc.*, 113 F. App'x 272, 273 (9th Cir. 2004) (holding its decision in *Kyocera Corp. v. Prudential-Bache Trade Services, Inc.*, 341 F.3d 987, 1000-02 (9th Cir. 2003) (en banc) mandated a determination that "terms of the arbitration agreement controlling the mode of judicial review are unenforceable and severable"); *Kyocera*, 341 F.3d at 1000-02 (en banc) (holding, as a matter of California state contract law, that invalid de novo review provisions in arbitration agreements would not render invalid the

agreement to engage in binding arbitration). Thus, the decision in *Hall Street Associates* does not speak to the severability question currently before this court.

## 2. Severability Analysis

"[A]rbitration is a matter of contract." *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 67 (2010). "The FAA . . . places arbitration agreements on an equal footing with other contracts and requires courts to enforce them according to their terms. Like other contracts, however, they may be invalidated by generally applicable contract defenses . . . ." *Id.* at 67-68 (citations and quotation omitted). "A compact is a form of contract." *Pueblo of Santa Ana*, 104 F.3d at 1556. It is a creation of IGRA, which determines a gaming compact's effectiveness and permissible scope. *See Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 48-49 (1996); 25 U.S.C. § 2710(d)(3). For that reason, a gaming compact is similar to a "congressionally sanctioned interstate compact the interpretation of which presents a question of federal law." *Cuyler v. Adams*, 449 U.S. 433, 442 (1981); *see also Gaming Corp. of Am. v. Dorsey & Whitney*, 88 F.3d 536, 546 (8th Cir. 1996) ("Tribal-state compacts are at the core of the scheme Congress developed to balance the interests of the federal government, the states, and the tribes. They are a creation of federal law, and IGRA prescribes the permissible scope of a Tribal–State compact . . . ." (quotation omitted)).[17]

---

[17]It is for this very reason that this court has jurisdiction over the instant
(continued...)

-25-

Accordingly, in interpreting the Compact, including whether the de novo review provision is material to the parties' agreement to engage in binding arbitration, we look to the federal common law. *See Puma Band of Luiseno Mission Indians v. California*, 813 F.3d 1155, 1163 (9th Cir. 2015) ("General principles of federal contract law govern . . . Compacts, which were entered pursuant to IGRA." (quotation omitted)).[18]

Under federal contract principles, if the terms of a contract are not ambiguous, this court determines the parties' intent from the language of the agreement itself. *See Anthony v. United States*, 987 F.2d 670, 673 (10th Cir.

---

[17](...continued)
appeal. *See Cabazon Band of Mission Indians v. Wilson*, 124 F.3d 1050, 1056 (9th Cir. 1997) ("The State's obligation to the Bands thus originates in the Compacts. The Compacts quite clearly are a creation of federal law; moreover, IGRA prescribes the permissible scope of the Compacts. We conclude that the Bands' claim to enforce the Compacts arises under federal law and thus that we have jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1362."); *see also Forest Cnty. Potawatomi Cmty. of Wisc v. Norquist*, 45 F.3d 1079, 1082 (7th Cir. 1995) (holding federal jurisdiction was proper and noting rights flowing from a gaming compact are federal rights).

[18]This court's opinion in *Pueblo of Santa Ana v. Kelly*, 104 F.3d 1546, 1557-59 (10th Cir. 1997), is not to the contrary. In that case, we examined whether a gaming compact purportedly entered into by New Mexico was valid ab initio. *Id.* at 1548. This court recognized that as a general matter "the validity of a compact necessitates an interpretation of both federal and state law." *Id.* at 1557. As to the narrow question "whether a state has validly bound itself to a compact," the court determined state law controlled. *Id.* Here, on the other hand, the materiality of Compact Part 12(3) to the parties' agreement to engage in binding arbitration turns on routine matters of contract law (the intent of the parties), not on some particular or peculiar aspect of the laws of Oklahoma or the Nation. As set out above, the federal common law of contracts provides a ready vehicle for resolving that question.

1993); *see also Arizona v. Tohono O'odham Nation*, 818 F.3d 549, 560-61 (9th Cir. 2016) ("Federal common law follows the traditional approach for the parol evidence rule: A contract must be discerned within its four corners, extrinsic evidence being relevant only to resolve ambiguity in the contract." (quotation and alterations omitted)).[19] Further, this court will construe the Compact to give meaning to every word or phrase. *See United States v. Brye*, 146 F.3d 1207, 1211 (10th Cir. 1998).

When considered as a whole, Compact Part 12 makes clear that the parties' agreement to engage in binding arbitration was specifically conditioned on, and inextricably linked to, the availability of de novo review in federal court. The Compact contains a specific severability provision.[20] This provision requires a

---

[19]Even if this court's decision in *Pueblo of Santa Ana* could plausibly be read for the proposition that Oklahoma law plays some part in the interpretation of the Compact, such a conclusion would not have any impact on the resolution of this case because Oklahoma's law of contract interpretation mirrors the federal common law. *See Gamble, Simmons & Co. v. Kerr-McGee Corp.*, 175 F.3d 762, 767 (10th Cir. 1999) (acknowledging that, in Oklahoma, "[i]f the contract is unambiguous its language is the only legitimate evidence of what the parties intended, and [courts] will not rely on extrinsic evidence to vary or alter the plain meaning" (citation omitted)); *see also* Okla. Stat. tit. 15, § 154 ("The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve absurdity.")

[20]Compact Part 13(A) provides as follows:

> Each provision, section, and subsection of this Compact shall stand separate and independent of every other provision, section, or subsection. In the event that a federal district court shall find any provision, section, or subsection of this Compact to be invalid, the

(continued...)

-27-

materiality analysis to determine whether the parties would have agreed to engage in binding arbitration if they had known de novo review of an arbitration award was unavailable. Compact Part 12(2), the provision establishing binding arbitration, specifically limits that requirement to the availability of de novo review as set out in Compact Part 12(3). Okla. Stat. tit. 3A, § 281 ("*Subject to the limitation set forth in paragraph 3 of this Part*, either party may refer a dispute arising under this Compact to arbitration under the rules of the American Arbitration Association (AAA), *subject to enforcement or pursuant to review as provided by paragraph 3 of this Part by a federal district court*." (emphasis added)). Compact Part 12(3) makes clear that federal district court review includes de novo review and that the district court's de novo review is subject to appeal to this court.

Importantly, the Compact links the parties' waivers of sovereign immunity to the kind of judicial review available. Part 12(2) of the Compact authorizes arbitration subject to de novo review in federal court as provided in Part 12(3), while Part 12(3) states that the parties "waive[] immunity and consent[] to suit [in federal court] for such limited purposes." *Id.* That is, the language of the

[20](...continued)
remaining provisions, sections, and subsections of this Compact shall remain in full force and effect, unless the invalidated provision, section or subsection is material.

Okla. Stat. tit. 3A, § 281.

-28-

Compact makes clear that the parties' waiver of sovereign immunity is only for purposes of the type of de novo review contemplated in Part 12(3), not for suits to enforce an arbitration award under the limited review procedures set out in 9 U.S.C. §§ 9-11. Given the importance of immunity as an aspect of sovereignty, *Alden v. Maine*, 527 U.S. 706, 713 (1999), the narrow and purposeful waiver in Part 12(3) makes clear that the availability of de novo review was a material aspect of the parties' agreement to arbitrate.

In response to all this, the Nation does not argue Compact Part 12(3) or, for that matter, any portion of Compact Part 12 is ambiguous. Thus, its reliance on extrinsic evidence is inappropriate because, absent such ambiguity, there is no need to look beyond the four corners of the Compact to resolve the question of materiality. *Anthony*, 987 F.2d at 673. Even if extrinsic evidence were admissible, however, the extrinsic evidence offered by the Nation is simply not meaningfully relevant to the question of materiality. The Nation relies solely on Governor Henry's statement during arbitration proceedings that "the arbitration clause was included to resolve disputes straightaway and to preserve each party's sovereignty." According to the Nation, this bare snippet of testimony "is harmonious with *Hall Street*'s primary basis for declining to permit expansion of the FAA standard of review." The Nation's Br. at 24. That the arbitration clause was included to "resolve disputes straightaway" says almost nothing about the parties' insistence on including a de novo review provision in Part 12. We are

unwilling to infer from the parties' apparent desire to resolve disputes expeditiously a desire to arbitrate disputes at the expense of a specific provision meant to maintain critical aspects of the parties' sovereign immunity.

Finally, the Nation speculates that invalidating the arbitration clause might result in enforcement problems when future disputes arise between it and Oklahoma. It is far from clear this is a viable consideration in assessing the materiality of Part 12(3) of the Compact. The Nation has not identified, and this court has not found, any precedent indicating federal courts are empowered to overlook material provisions of a contract, especially when those material provisions are intended to protect the sovereign interests of a tribe and a State, on the basis of what this court might perceive to be sound public policy.[21]

Because the availability of de novo review is a material aspect of the parties' agreement to engage in binding arbitration, and because *Hall Street Associates* renders the de novo review provision legally unenforceable, the district court erred in refusing to sever Compact Part 12(2) from the Compact.

---

[21]In any event, the Nation's assertion is only true if it is now taking the position it will invoke its sovereign immunity to avoid federal-court adjudication of any future dispute. In its brief on appeal, Oklahoma solemnly states it will readily litigate such disputes in federal court. Given that in the Compact, Oklahoma and the Nation explicitly agreed to waive sovereign immunity in federal court for the purpose of de novo review of arbitration decisions, it is difficult for the Nation to creditably argue submitting disputes related to gaming or gaming compacts to federal courts for resolution as an initial matter is not a viable option.

## IV. CONCLUSION

For those reason set out above, the matter is **REMANDED** to the United States District Court for the Western District of Oklahoma to enter an order **VACATING** the arbitration award.