Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

### FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued March 13, 2003        Decided June 6, 2003

No. 02-5142

AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES,
AFL–CIO, ET AL.,
APPELLANTS

v.

UNITED STATES OF AMERICA, ET AL.,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(00cv00936)

———

*Anne M. Wagner* argued the cause for appellants. With her on the brief was *Mark Roth*.

*Sarah E. Harrington*, Attorney, U.S. Department of Justice, argued the cause for the federal appellees. With her on the brief was *Mark L. Gross*, Attorney.

———

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

*Harvey A. Levin* argued the cause and filed the brief for appellees Chugach Management Services Joint Venture, et al.

Before: RANDOLPH and ROGERS, *Circuit Judges,* and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* RANDOLPH.

RANDOLPH, *Circuit Judge*: Section 8014 of the Defense Appropriations Act for fiscal year 2000 granted an outsourcing preference for firms "under 51 percent Native American ownership," Pub. L. No. 106–79, § 8014(3), 113 Stat. 1212, 1234 (1999). The question is whether this preference constituted racial discrimination in violation of the Fifth Amendment's Due Process Clause.

Plaintiffs are the American Federation of Government Employees, AFL–CIO; an affiliated local union representing civilian Defense Department employees at the Kirtland Air Force Base in New Mexico; and two civilian Defense Department employees who were allegedly displaced when the Air Force, invoking § 8014(3), awarded a contract to Chugach Management Services Joint Venture in July 2000 to perform maintenance work at the base. The contract was for one year, with nine one-year options to renew. Chugach is a joint venture of Chugach Management Services, Inc., and Alutiiq Management Services, LLC. Chugach Management Services is a wholly owned subsidiary of Chugach Alaska Corporation, one of the Alaska Native Corporations established under the Alaska Native Claims Settlement Act. *See* 43 U.S.C. § 1606(a)(9). Alutiiq is a wholly owned subsidiary of Afognak Village Corporation, one of the village corporations formed pursuant to that legislation. *See* 43 U.S.C. §§ 1607, 1610(b)(1). Both Chugach Alaska Corporation and Afognak Village Corporation are federally recognized Indian tribes. 25 U.S.C. § 450b(e). Their joint venture thus qualified for special treatment under § 8014(3) of the FY 2000 appropriations act. The nature of the special treatment is as follows.

The FY 2000 appropriations act prohibited the Defense Department from using appropriated funds to pay private contractors for performing work previously done by more

than ten government employees unless the Department first performed a "most efficient and cost-effective organization analysis" and certified the analysis to the House and Senate Committees on Appropriations. Department of Defense Appropriations Act, 2000, Pub. L. No. 106–79, § 8014, 113 Stat. 1212, 1234 (1999). This provision contained an exception for a "commercial or industrial type function of the Department of Defense" that was "planned to be converted to performance by a qualified firm under 51 percent Native American ownership." *Id.* § 8014(3), 113 Stat. 1234. A similar exception first appeared in the Defense Appropriations Act for fiscal year 1990; appropriations acts for fiscal years 1991 through 1999 contained similar language. *See* Pub. L. No. 101–165, § 9036, 103 Stat. 1112, 1137 (1989) (FY 1990); Pub. L. No. 101–511, § 8026, 104 Stat. 1856, 1880 (1990) (FY 1991); Pub. L. No. 102–172, § 8026, 105 Stat. 1150, 1177 (1991) (FY 1992); Pub. L. No. 102–396, § 9026, 106 Stat. 1876, 1906 (1992) (FY 1993); Pub. L. No. 103–139, § 8022, 107 Stat. 1418, 1442 (1993) (FY 1994); Pub. L. No. 103–335, § 8020, 108 Stat. 2599, 2621 (1994) (FY 1995); Pub. L. No. 104–61, § 8020, 109 Stat. 636, 656 (1995) (FY 1996); Pub. L. No. 104–208, § 8015, 110 Stat. 3009, 3009–91 (1996) (FY 1997); Pub. L. No. 105–56, § 8014, 111 Stat. 1203, 1223 (1997) (FY 1998); Pub. L. No. 105–262, § 8014, 112 Stat. 2279, 2300 (1998) (FY 1999).

The Chugach contract at Kirtland was the only one the Air Force awarded pursuant to § 8014(3) of the FY 2000 appropriations act, and so far as the parties know, the only such contract awarded by the Defense Department. In the next year Congress altered the language of § 8014(3), so that the exception applied not to "Native American ownership" but to "ownership by an Indian tribe, as defined in section 450b(e) of title 25, United States Code, or a Native Hawaiian organization, as defined in section 637(a)(15) of title 15, United States Code." Department of Defense Appropriations Act, 2001, Pub. L. No. 106–259, § 8014, 114 Stat. 656, 677 (2000).

In the district court, plaintiffs claimed that § 8014(3), as contained in the FY 2000 act, violated the equal protection component of the Due Process Clause and deprived them of an interest in federal employment in violation of substantive

due process. The district court granted Chugach's motion to intervene as a defendant, and denied plaintiffs' motion for a preliminary injunction. *Am. Fed'n of Gov't Employees v. United States*, 104 F. Supp. 2d 58 (D.D.C. 2000). Both sides later moved for summary judgment. The court construed the statute to apply only to ownership by an Indian tribe and, applying rational basis review, found no unconstitutional discrimination. *Am. Fed'n of Gov't Employees v. United States*, 195 F. Supp. 2d 4, 18–24 (D.D.C. 2002). The court also granted summary judgment for the defendants on the substantive due process claim, finding no fundamental right to federal employment. *Id.* at 25.

Plaintiffs believe § 8014(3) is unconstitutional under *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 227 (1995), because "Native American" is a racial classification, and because § 8014(3) does not serve a "compelling governmental interest" and is not "narrowly tailored to further that interest." *Adarand*, 515 U.S. at 235. The statute is not "narrowly tailored" to benefit Native Americans, they say, in light of the fact that non-Indians may own as much as 49 percent of a qualifying firm. The statute does not serve a "compelling interest" because there is no evidence, no congressional findings, no record of legislative deliberations, to demonstrate that Congress thought it was acting to fulfill its historic trust responsibilities toward Indians.

For its part, the government urges us to construe § 8014(3) to avoid any constitutional doubts plaintiffs may have raised and to hold that the provision applies only to "members" of federally recognized Indian tribes and "tribal entities." The government believes these classifications are, in light of *Morton v. Mancari*, 417 U.S. 535, 551 (1974), non-racial and hence constitutional so long as they rationally relate to the government's trust responsibilities toward Indian tribes. Brief for Federal Appellees at 15. Although there was no regulation or formal policy reflecting the government's suggested interpretation of § 8014(3), the Defense Department may have followed it in practice. The government's statement of material facts not in dispute, and an affidavit from an Air Force contracting officer, indicate that other than the Kirtland

contract, the Air Force had only once before – under an earlier appropriations act – awarded a contract pursuant to a comparable provision. That contract also went to an Alaska Native Corporation.

We will begin our analysis with some winnowing. Among their prayers for relief, plaintiffs sought to enjoin the government from awarding "any contract under the preference given to 51% Native-American owned firms in § 8014 of FY 2000 Defense Appropriations Act." That fiscal year has long since passed. This particular claim for relief, which we read as referring to initial awards of contracts, is therefore moot. Plaintiffs also sought to enjoin the government from renewing "any contract granted under, or otherwise in effect due to" the preference in § 8014(3). For plaintiffs to have standing to seek such broad relief – relating not just to the renewal of the contract at Kirtland, but to the renewal of "any contract" – they must be under some real and imminent threat of harm. The Supreme Court in *Adarand*, 515 U.S. at 211, so held in a similar situation. But plaintiffs have not established that they are under such a threat. They have identified no other § 8014(3) contract still subject to renewal. Plaintiffs therefore lack standing to pursue this claim for relief insofar as it relates to contracts other than the one at Kirtland.

We believe the case must be narrowed in another, related respect. Although the Kirtland § 8014(3) contract was awarded to a firm wholly owned by federally recognized Indian tribes, plaintiffs want us to decide that the provision is unconstitutional because, in FY 2000, it authorized preferences not only for Indian tribes but also for firms owned by Native Americans who were not tribal members and who owned no more than 51 percent of the firm. Plaintiffs thus want to expand this case well beyond its factual context. Prudence, as reflected in a longstanding rule of constitutional adjudication, counsels otherwise. The Supreme Court summarized the rule in *United States v. Raines*, 362 U.S. 17, 21 (1960): "one to whom application of a statute is constitutional will not be heard to attack the statute on the ground that impliedly it might also be taken as applying to other persons or other situations in which its application might be unconsti-

tutional." The Court reiterated the point in *Broadrick v. Oklahoma*, 413 U.S. 601, 610 (1973): "Embedded in the traditional rules governing constitutional adjudication is the principle that a person to whom a statute may constitutionally be applied will not be heard to challenge that statute on the ground that it may conceivably be applied unconstitutionally to others, in other situations not before the Court." These passages, we believe, describe plaintiffs' arguments in this case. The only relief they are possibly entitled to receive, for reasons already mentioned, is specific to Kirtland. Yet they spend almost all their time objecting to § 8014(3)'s preference in favor of non-tribal Native American firms.

To put the matter somewhat differently, the "Native Americans" preference in § 8104(3) breaks down into at least three possible classifications: (1) federally recognized Indian tribes, (2) members of federally recognized Indian tribes, and (3) all others who might be deemed Native Americans. If these three classifications had been set forth as separate subsections, and if we had a case involving only a preference granted under (1), we would normally confine our decision to the validity of that provision and apply rational basis review. We say "normally" because the situation might be different if the injured party were claiming that Congress, in enacting (1), had some illegitimate purpose in mind, *compare Washington v. Davis*, 426 U.S. 229 (1976), or that Congress would not have enacted (1) unless the other subsections were included in the statute. But plaintiffs here have made no such claims. Nor have they offered anything to suggest that there were any other § 8014(3) contracts awarded in FY 2000, or that any contract went to the type of Native American firm they imagine, or that they were thereby adversely affected. We will therefore limit our decision to the facts of this case. The only question properly before us is whether the government violated the equal protection component of the Due Process Clause when it invoked § 8014(3) to grant a contract to a firm wholly owned by Indian tribes.

Our approach is, we believe, not only faithful to Article III of the Constitution, but also consistent with the Court's admonition in *Raines* that federal courts should avoid "pre-

mature interpretations of statutes in areas where their constitutional application might be cloudy." *Raines*, 362 U.S. at 22. In saying this, the Court had in mind another doctrine of constitutional adjudication. For many years, the Court has followed a practice of construing federal statutes to avoid serious doubts about the statutes' constitutionality without the saving constructions. *See* Adrian Vermeule, *Saving Constructions*, 85 GEO. L.J. 1945 (1997). This is the practice the government asks us to follow in this case: when "an otherwise acceptable construction of a statute would raise serious constitutional problems, [a court] will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress." *Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988). Judge Friendly believed the doctrine had to be confined to cases in which "the doubt is exceedingly real. Otherwise this rule, whether it be denominated one of statutory interpretation or, more accurately, of constitutional adjudication – still more accurately, of constitutional nonadjudication – is likely to become one of evisceration and tergiversation." HENRY J. FRIENDLY, BENCHMARKS 211–12 (1967).

Judge Friendly's formulation captures an important qualification to the saving-construction doctrine – namely, that the constitutional doubt must be "real." Hypothetical applications of a statute, or to be more precise, hypothetical applications of § 8014(3), must be likely. Otherwise the constitutional doubt raised by legal arguments about those hypothetical applications cannot be considered real. Without this qualification, the courts would risk giving advisory and unnecessary statutory interpretations, based on judicial expressions of doubts regarding the constitutionality of statutes as applied to situations that may never arise. For these reasons, and because we believe the only issue properly before us is the validity of a preference for Indian tribes, we decline the government's request for a narrowing interpretation of § 8014(3).

What we have written thus far is consistent with the Supreme Court's disposition in *Adarand*. Under federal law, some prime contractors received additional compensation if

they hired as subcontractors firms owned by individuals who were socially and economically disadvantaged. "Black Americans, Hispanic Americans, Native Americans, Asian Pacific Americans, and other minorities" were presumed to be socially and economically disadvantaged. 515 U.S. at 205. A subcontractor sued after a prime contractor rejected its low bid in favor of a firm in one of these racial categories. Which racial category did not matter. Adarand wished to bid on government contracts in the future; the preference would therefore injure it no matter which of the listed minority groups owned the competing firm. The Court therefore did not focus on the Native American classification. Even if it had, and even if it had limited the preference to Indian tribes, we very much doubt that the doctrine of severability could have been stretched to save this small part of the law. *See, e.g.*, *United States v. Nat'l Treasury Employees Union*, 513 U.S. 454, 479 & n.26 (1995).

With respect to the question properly before us, only a few general principles of federal Indian law need to be mentioned. Congress has the power "[t]o regulate Commerce . . . with the Indian Tribes," U.S. CONST. art. I, § 8, cl. 3. Congress thus has the authority, exclusive of the States, to determine which "distinctly Indian communities" should be recognized as Indian tribes. *United States v. Sandoval*, 231 U.S. 28, 46 (1913). The "plenary power of Congress, based on a history of treaties and the assumption of a 'guardian-ward' status, to legislate on behalf of federally recognized Indian tribes . . . is drawn both explicitly and implicitly from the Constitution itself." *Mancari*, 417 U.S. at 551–52. For these reasons, and others, the Supreme Court has sustained "legislation that singles out Indians for particular and special treatment." *Id.* at 554–55. The Court's decisions "leave no doubt that federal legislation with respect to Indian tribes, although relating to Indians as such, is not based on impermissible racial classifications." *United States v. Antelope*, 430 U.S. 641, 645 (1977).

*Morton v. Mancari*, for instance, upheld a longstanding statutory preference for hiring members of federally recognized Indian tribes to fill positions in the Department of Interior's Bureau of Indian Affairs. Two years after *Man-*

*cari*, the Court sustained as against an equal protection challenge a court-ordered exemption from a state sales tax for cigarettes sold on a reservation to tribal members residing on the reservation. *See Moe v. Confederated Salish & Kootenai Tribes of Flathead Reservation*, 425 U.S. 463, 479–80 (1976). In both cases, the Court tested the special preference in terms similar to those used in judging equal protection attacks on other economic legislation. *See United States R.R. Ret. Bd. v. Fritz*, 449 U.S. 166, 174–76 (1980); *Williamson v. Lee Optical*, 348 U.S. 483, 491 (1955). For legislation regulating commerce with Indian tribes, as "long as the special treatment can be tied rationally to the fulfillment of Congress' unique obligation toward the Indians, such legislative judgments will not be disturbed." *Mancari*, 417 U.S. at 555; *Delaware Tribal Business Comm. v. Weeks*, 430 U.S. 73, 85 (1977); *Moe*, 425 U.S. at 480. In *Narragansett Indian Tribe v. National Indian Gaming Commission*, 158 F.3d 1335 (D.C. Cir. 1998), we summed up the state of the law this way: "ordinary rational basis scrutiny applies to Indian classifications just as it does to other non-suspect classifications under equal protection analysis." *Id.* at 1340.

On the other hand, "all racial classifications, imposed by whatever federal, state, or local governmental actor, must be analyzed by a reviewing court under strict scrutiny. In other words, such classifications are constitutional only if they are narrowly tailored measures that further compelling governmental interests." *Adarand*, 515 U.S. at 227.

These two lines of authority may be reconciled, plaintiffs argue, on the basis that the preference in *Mancari* was limited to members of federally recognized Indian tribes, while the preference in *Adarand* was not so limited, and thus constituted – in the Court's words in *Mancari* – a preference "granted to Indians . . . as a discrete racial group," 417 U.S. at 554; *see United States Air Tour Ass'n v. FAA*, 298 F.3d 997, 1012 n.8 (D.C. Cir. 2002); *Narragansett Indian Tribe*, 158 F.3d at 1340–41. That distinction aside, the Supreme Court has made it clear enough that legislation for the benefit of recognized Indian tribes is not to be examined in terms applicable to suspect racial classifications. Not only in *Man-*

*cari*, but also in *Washington v. Confederated Bands & Tribes of Yakima Indian Nation*, 439 U.S. 463, 500–01 (1979), the Court held that " 'the unique legal status of Indian tribes under federal law' permits the Federal Government to enact legislation singling out tribal Indians, legislation that might otherwise be constitutionally offensive" (quoting *Mancari*, 417 U.S. at 551–52).

Despite these precedents, plaintiffs argue that § 8014(3) should be tested by "strict scrutiny" rather than rational basis review because the Supreme Court in *Mancari* thought it important that the preference for tribal members there applied only to employment in the Indian service. *See Rice v. Cayetano*, 528 U.S. 495, 519–20 (2000); *Williams v. Babbitt*, 115 F.3d 657, 663–64 (9th Cir. 1997). Hence the Court did not have to face what it called "the obviously more difficult question" whether "a blanket exemption for Indians from all civil service examinations" would be constitutional. *Mancari*, 417 U.S. at 554. The preference in § 8014(3), plaintiffs say, is analogous to such a blanket exemption: it is not restricted to Indian activities on or near reservations or Indian land; and it does not deal with uniquely Indian interests.

Whatever the significance of the *Mancari* dictum – the Court said the case would be "more difficult," not that the blanket exemption would be unconstitutional – the question before us is not in the "difficult" category. The critical consideration is Congress' power to regulate commerce "with the Indian Tribes." While Congress may use this power to regulate tribal members, *see United States v. Holliday,* 70 U.S. 407, 417 (1865)*,* regulation of commerce with tribes is at the heart of the Clause, particularly when the tribal commerce is with the federal government, as it is here. 2 THE FOUNDERS' CONSTITUTION 530–31 (Philip B. Kurland & Ralph Lerner eds. 1987). When Congress exercises this constitutional power it necessarily must engage in classifications that deal with Indian tribes. Justice Scalia, when he was on our court, put the matter this way: "in a sense the Constitution itself establishes the rationality of the . . . classification, by providing a separate federal power that reaches only the present group." *United States v. Cohen*, 733 F.2d 128, 139

(D.C. Cir. 1984) (en banc). He then quoted the following passage from *United States v. Antelope*, 430 U.S. at 649 n.11: the "Constitution itself provides support for legislation directed specifically at Indian tribes."

As to the rational basis for § 8014(3), plaintiffs say the objective cannot be the obvious one – namely, tribal economic development, which the Supreme Court has described as an "important federal interest[ ]." *California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 216–17 (1987). They point to "the absence of any evidence suggesting Congress' actual intent with regard to § 8014." Reply Brief at 18–19. By this they apparently mean, as they said in discussing strict scrutiny, that "Congress did not hold hearings, make findings, or otherwise generate a strong record" regarding any "socioeconomic hardships suffered by Native Americans"; that the statute "contains no language defining its purpose or otherwise illuminating Congress' intent"; and that no one can say what actually "motivated" Congress. Brief for Appellants at 21–22. But Congress is not required to "articulate its reasons for enacting a statute." *Fritz*, 449 U.S. at 179. The Constitution grants Congress discretion to regulate its internal proceedings. Article I, § 5, cl. 2, for example, empowers it to determine the rules of its proceedings. Incident to its lawmaking authority, Congress has the authority to decide whether to conduct investigations and hold hearings to gather information. *See Watkins v. United States*, 354 U.S. 178, 193 (1957); *McGrain v. Daugherty*, 273 U.S. 135, 174–75 (1927). And under the Constitution, Congress has broad discretion in determining what must be published in the official record. *See Field v. Clark*, 143 U.S. 649, 671 (1892). As Professor Currie has pointed out, in the First Congress Senate deliberations were not even open to the public and the House did not provide verbatim transcripts of debates. David P. Currie, *The Constitution in Congress: The First Congress and the Structure of Government, 1789–1791*, 2 U. Chi. L. Sch. Roundtable 161, 166 (1995). While "[e]ach House shall keep a Journal of its Proceedings," U.S. Const. art. I, § 5, cl. 3, there is certainly no textual basis for requiring Congress to hold hearings, issue committee reports, or enact findings or

statements of purpose, *see Nixon v. United States*, 506 U.S. 224, 228–29 (1993), even though these might assist judicial review and sometimes carry weight. *See Bd. of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356, 368–72 (2001); *United States v. Lopez*, 514 U.S. 549, 562–63 (1995); *but cf. Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 664–68 (1994) (plurality opinion). If "there are plausible reasons for Congress' action, our inquiry is at an end," even if Congress did not expressly state those reasons or act on them. *Fritz*, 449 U.S. at 179; *United States v. O'Brien*, 391 U.S. 367, 383 (1968).

It was therefore entirely proper for the district court to examine legislative material, generated in other contexts, showing the need for economic development of federally recognized tribes in Alaska. *Am. Fed'n of Gov't Employees*, 195 F. Supp. 2d at 23. The United States has marshalled still more authorities to the same effect but we see no need to go into them. Brief for Federal Appellees at 31–36 & nn.15–22. Plaintiffs do not really dispute the material. They say that it cannot be considered, a claim we have just rejected. We therefore hold that the preference in § 8014(3), by promoting the economic development of federally recognized Indian tribes (and thus their members), is rationally related to a legitimate legislative purpose and thus constitutional. *See Kimel v. Florida Bd. of Regents*, 528 U.S. 62, 83 (2000).

All that remains is plaintiffs' claim, made in one paragraph of their brief, that § 8014(3) violates substantive due process under the Fifth Amendment because they, or at least some of them, have a property interest in federal employment. The government may infringe upon fundamental property interests only if the infringement is "narrowly tailored to serve a compelling state interest." *Reno v. Flores*, 507 U.S. 292, 302 (1993). Absent a suspect classification or infringement of a fundamental interest, the Fifth Amendment requires only a rational basis. *FCC v. Beach Communications, Inc.*, 508 U.S. 307, 313 (1993); *Waters v. Rumsfeld*, 320 F.3d 265, 268 (D.C. Cir. 2003). Neither the Supreme Court nor this court has ever recognized an interest in public employment as fundamental. In fact, the Supreme Court has said that its decisions "give no support to the proposition that a right of

government employment *per se* is fundamental," *Massachusetts Bd. of Ret. v. Murgia*, 427 U.S. 307, 313 (1976) (per curiam), a statement the Court later described as a holding that "there is no fundamental right to government employment." *United Bldg. & Constr. Trades Council v. Mayor & Council of Camden*, 465 U.S. 208, 219 (1984). The right that plaintiffs allege is thus not one "so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Flores*, 507 U.S. at 303 (internal quotation marks omitted). Accordingly, rational basis review applies and plaintiffs have failed to satisfy that standard for the same reasons their equal protection challenge fails.

The judgment of the district court granting summary judgment for the federal defendants and the intervenor-defendants is therefore

*Affirmed.*