# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued December 14, 2022         Decided June 30, 2023

No. 21-5265

WEST FLAGLER ASSOCIATES, LTD., A FLORIDA LIMITED
PARTNERSHIP, DOING BUSINESS AS MAGIC CITY CASINO AND
BONITA-FORT MYERS CORPORATION, A FLORIDA
CORPORATION, DOING BUSINESS AS BONITA SPRINGS POKER
ROOM,
APPELLEES

v.

DEBRA A. HAALAND, IN HER OFFICIAL CAPACITY AS
SECRETARY OF THE UNITED STATES DEPARTMENT OF THE
INTERIOR AND UNITED STATES DEPARTMENT OF THE
INTERIOR,
APPELLEES

SEMINOLE TRIBE OF FLORIDA,
APPELLANT

———

Consolidated with 22-5022

———

Appeals from the United States District Court
for the District of Columbia
(No. 1:21-cv-02192)

———

*Rachel Heron*, Attorney, U.S. Department of Justice, argued the cause for federal appellants. With her on the briefs was *Todd Kim*, Assistant Attorney General.

*Barry Richard* argued the cause for appellant Seminole Tribe of Florida. With him on the briefs were *Joseph H. Webster, Elliott A. Milhollin,* and *Kaitlyn E. Klass.*

*Barry Richard*, *Joseph H. Webster, Elliott A. Milhollin,* and *Kaitlyn E. Klass* were on the brief for *amicus curiae* Seminole Tribe of Florida in support of federal appellants. *Henry C. Whitaker,* Solicitor General, Office of the Attorney General for the State of Florida, argued the cause for *amicus curiae* State of Florida in support of federal appellants. With him on the brief was *Ashley Moody,* Attorney General, and *Christopher J. Baum*, Senior Deputy Solicitor General.

*Scott Crowell* was on the brief for *amici curiae* The National Indian Gaming Association, et al. in support of federal appellants.

*Todd Kim*, Assistant Attorney General, and *Rachel Heron*, Attorney, U.S. Department of Justice, were on the answering brief for federal appellees.

*Hamish P. M. Hume* argued the cause for appellees West Flagler Associates, Ltd, et al. With him on the brief were *Amy L. Neuhardt* and *Jon Mills.*

*Jenea M. Reed* argued the cause for *amici curiae* Monterra MF, LLC, et al. in support of appellees. With her on the brief was *Eugene E. Stearns.*

Before: HENDERSON, WILKINS and CHILDS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* WILKINS.

WILKINS, *Circuit Judge*: In 2021, the Seminole Tribe of Florida ("Tribe") and the State of Florida entered into a compact under the Indian Gaming Regulatory Act ("IGRA"), the federal law that regulates gaming on Indian lands. That gaming compact ("Compact"), along with accompanying changes in state law, purported to permit the Tribe to offer online sports betting throughout the state. The Compact became effective when the Secretary of the Interior failed to either approve or disapprove it within 45 days of receiving it from the Tribe and Florida.

The Plaintiffs in this case, brick-and-mortar casinos in Florida, object to the Secretary's decision to allow the Compact to go into effect because in their view, it impermissibly authorizes gaming *outside* of Indian lands, violating IGRA. They also believe that the Compact violates the Wire Act, the Unlawful Internet Gambling Enforcement Act, and the Fifth Amendment, and that the Secretary was required to disapprove the Compact for those reasons as well. The suit named as Defendants the Secretary of the Interior and the Department of the Interior, and the Tribe moved to intervene for the limited purpose of filing a Rule 19 motion to dismiss based on its tribal sovereign immunity. The District Court denied the Tribe's motion and granted summary judgment for the Plaintiffs, finding that the Compact here "attempts to authorize sports betting both on and off Indian lands[,]" in violation of "IGRA's 'Indian lands' requirement." *W. Flagler Assocs. v. Haaland*, 573 F. Supp. 3d 260, 273 (D.D.C. 2021).

4

We see the case differently. IGRA "regulate[s] gaming on Indian lands, and nowhere else." *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 795 (2014). Thus, to be sure, an IGRA gaming compact can legally authorize a tribe to conduct gaming only on its own lands. But at the same time, IGRA does not *prohibit* a gaming compact—which is, at bottom, an agreement between a tribe and a state—from discussing other topics, including those governing activities "outside Indian lands[.]" *Id.* at 796. In fact, IGRA expressly contemplates that a compact "may" do so where the activity is "directly related to" gaming. 25 U.S.C. § 2710(d)(3)(C)(vii). The District Court erred by reading into the Compact a legal effect it does not (and cannot) have, namely, independently authorizing betting by patrons located outside of the Tribe's lands. Rather, the Compact itself authorizes only the betting that occurs on the Tribe's lands; in this respect it satisfied IGRA. Whether it is otherwise lawful for a patron to place bets from non-tribal land within Florida may be a question for that State's courts, but it is not the subject of this litigation and not for us to decide. Today, we hold only that the Secretary did not violate the Administrative Procedure Act ("APA") in choosing not to act and thereby allowing the Compact to go into effect by operation of law. We also find the Plaintiffs' remaining challenges to the Compact meritless, as a matter of law.

Finally, because this decision will effectively keep intact the Compact, resulting in minimal prejudice to the Tribe, we affirm the denial of the Tribe's motion to intervene, albeit on different grounds than did the District Court. Accordingly, we reverse and remand with instructions to enter judgment for the Secretary.

5

**I.**

**A.**

In 1987, the Supreme Court held that states are powerless to regulate gaming on Indian lands. *California v. Cabazon Band of Mission Indians*, 480 U.S. 202 (1987). In response to that decision, Congress the following year enacted IGRA, 25 U.S.C. § 2701 *et seq.*, which "creates a framework" for doing just that. *Bay Mills*, 572 U.S. at 785. Through IGRA, Congress sought to "balance state, federal, and tribal interests." *Amador Cnty. v. Salazar*, 640 F.3d 373, 376 (D.C. Cir. 2011). IGRA's purposes include "promoting tribal economic development" and "self-sufficiency," "ensur[ing] that the Indian tribe is the primary beneficiary of the gaming operation," and "shield[ing] [tribes] from organized crime and other corrupting influences[.]" 25 U.S.C. § 2702. Both *Cabazon* and IGRA "left fully intact" states' "capacious" regulatory power outside Indian territory. *Bay Mills*, 572 U.S. at 794.

IGRA "divides gaming into three classes." *Id.* at 785. Class III gaming, the kind at issue in this case, is "the most closely regulated" and includes casino games, slot machines, and sports betting. *Id.*; *see also* 25 U.S.C. § 2703(8). A tribe may offer class III gaming on its own lands "only pursuant to, and in compliance with, a compact it has negotiated with the surrounding State." *Bay Mills*, 572 U.S. at 785; *see also* 25 U.S.C. § 2710(d)(1)(C). "A compact typically prescribes rules for operating gaming, allocates law enforcement authority between the tribe and State, and provides remedies for breach of the agreement's terms." *Bay Mills*, 572 U.S. at 785.

Before it takes effect, a tribal-state compact must be approved by the Secretary of the Interior, with notice published in the Federal Register. 25 U.S.C. § 2710(d)(3)(B). When presented with a tribal-state compact, the Secretary can do one

of three things. *See Amador Cnty.*, 640 F.3d at 377 (summarizing the approval process). First, she may affirmatively approve the compact. 25 U.S.C. § 2710(d)(8)(A). Second, she "may disapprove" the compact, but "only if" the compact violates IGRA, another federal law, or the federal government's trust obligations to Indians. *Id.* § 2710(d)(8)(B). Third, if she does not act within 45 days, the compact is "considered . . . approved[,]" "but only to the extent the compact is consistent with the provisions of [IGRA]." *Id.* § 2710(d)(8)(C). The Secretary's decision to take no action within 45 days of receiving the compact, thereby allowing the compact to go into effect under subsection (C), is judicially reviewable. *Amador Cnty.*, 640 F.3d at 383.

## B.

The Seminole Tribe of Florida is a federally recognized tribal government. In 2010, it entered into a tribal-state compact with Florida, so that it could offer certain forms of class III gaming on its lands. In 2021, the Tribe and Florida entered into a new compact, the one at issue in this case ("Compact"). At that time, sports betting was illegal throughout the state, with exceptions not relevant here. Fla. Stat. § 849.14. The Compact and related amendments to state law changed this, purporting to allow the Tribe the exclusive right to offer sports betting in the state, including online sports betting by individuals not physically located on the Tribe's lands, as follows.

The Compact requires sports bets to be placed "exclusively by and through one or more sports books conducted and operated by the Tribe or its approved management contractor[.]" J.A. 687 (Compact § III.CC.1). Under the Compact, the Tribe and Florida in turn consider all bets placed through the Tribe's sports book, regardless of

where the person placing the bet is physically located within the state, to occur where the sports book servers are located— in other words, on tribal land:

> The Tribe and State agree that the Tribe is authorized to operate Covered Games on its Indian lands, as defined in [IGRA]. . . . Subject to limitations set forth herein, wagers on Sports Betting . . . made by players physically located within the State using a mobile or other electronic device shall be deemed to take place exclusively where received at the location of the servers or other devices used to conduct such wagering activity at a Facility on Indian Lands.

J.A. 692 (Compact § IV.A). Similar language appears in another section of the Compact as well. J.A. 687 (Compact § III.CC.2).

The Tribe and Florida executed the Compact in April 2021, and the following month, Governor DeSantis signed a bill that ratified and approved the Compact. That state law adopted the same "deeming" language from the Compact regarding the location of sports bets. Fla. Stat. § 285.710(13)(b)(7) (noting that all sports wagers "shall be deemed to be exclusively conducted by the Tribe where the servers or other devices used to conduct such wagering activity on the Tribe's Indian lands are located[,]" and that "[g]ames and gaming activities authorized under this subsection and conducted pursuant to a gaming compact . . . do not violate the laws of this state"). In June, the Tribe transmitted the Compact to Secretary Haaland for her review under IGRA. She did not act within the 45-day window, and the Compact accordingly went into effect under 25 U.S.C. § 2710(d)(8)(C). The Compact was published in the Federal Register on August 11,

2021, making it effective. Indian Gaming; Approval by Operation of Law of Tribal-State Class III Gaming Compact in the State of Florida, 86 Fed. Reg. 44,037-01 (Aug. 11, 2021).

## C.

The Plaintiffs in this case, West Flagler Associates, Ltd., d/b/a Magic City Casino, and Bonita-Fort Myers Corporation, d/b/a Bonita Springs Poker Room (collectively, "West Flagler"), operate brick-and-mortar casinos in Florida. They sued Secretary Haaland, in her official capacity, and the Department of the Interior (collectively, "the Secretary"), challenging the decision to not act on the Compact within 45 days. They allege that the Secretary's approval through inaction violated the APA for four reasons: (1) its authorization of gaming off of Indian lands was unlawful under IGRA, (2) it violated the Wire Act, (3) it violated the Unlawful Internet Gambling Enforcement Act ("UIGEA"), and (4) it violated the Fifth Amendment's equal protection guarantee. The Plaintiffs sought an injunction vacating and setting aside the Compact.

In the District Court, the Tribe moved to intervene for the limited purpose of filing a Rule 19 motion to dismiss. The Secretary and Plaintiffs opposed the Tribe's motion. Independently, the Secretary moved to dismiss for lack of standing and for failure to state a claim. The Plaintiffs moved for summary judgment.

The District Court considered all three motions together, along with parallel motions in another case involving a challenge to the same Compact by individuals and entities who are wholly opposed to the expansion of gambling within Florida. *See Monterra MF, LLC v. Haaland*, No. 21-cv-2513 (D.D.C.) (complaint filed Sept. 27, 2021). The District Court first denied the Tribe's motion to intervene, finding that it was

a required party but that its interests in this litigation were adequately represented by the Secretary, and therefore the litigation could proceed in the Tribe's absence in equity and good conscience. *See* FED. R. CIV. P. 19(b). The District Court then granted summary judgment for the West Flagler Plaintiffs, finding that the Compact violated IGRA because its online sports betting provisions impermissibly attempted to authorize gaming *off* of Indian lands; accordingly, the Secretary had an affirmative duty to reject it. Finding that the entire Compact must be set aside, the District Court finally dismissed the motions in the *Monterra* litigation as moot, and that portion of the decision is not on appeal. (The *Monterra* plaintiffs have appeared as *amici* in this case and urge affirmance.)

The Tribe appealed the denial of its motion to intervene, which the Secretary and Plaintiffs oppose. The Secretary appealed the grant of summary judgment for Plaintiffs.

## II.

We first address the merits of West Flagler's challenge to the Compact, followed by the Tribe's motion to intervene. We review a district court's decision granting summary judgment *de novo*. *Lopez v. Council on American-Islamic Rels. Action Network, Inc.*, 826 F.3d 492, 496 (D.C. Cir. 2016). No material fact is in dispute; the issues on appeal are purely legal.

West Flagler's claims arise under the APA. The APA requires a reviewing court to "hold unlawful and set aside agency action . . . found to be[] (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; [or] (B) contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(A)–(B). When reviewing a Secretary's decision to not act within the 45-day window when presented with an IGRA compact, this Court has held that 25 U.S.C. § 2710(d)(8)(C) "provides the 'law to apply[]'"—that

is, "the compact is deemed approved 'but only to the extent the compact is consistent with the provisions of [IGRA].'" *Amador Cnty.*, 640 F.3d at 381 (alteration in original).

**A.**

West Flagler's primary challenge to the Compact is that its online sports betting provisions unlawfully authorize class III gaming outside of Indian lands, in violation of IGRA. In West Flagler's view, our decision in *Amador County* stands for the principle that "IGRA requires the Secretary to 'affirmatively disapprove' any compact that seeks to authorize gaming off Indian lands." West Flagler Br. 20. They argue in turn that the Compact, both in text and effect, necessarily violates that principle. On appeal, the Secretary agrees with the major premise of West Flagler's claim—that IGRA cannot provide an independent source of legal authority for gaming outside of Indian lands—but with one caveat. In her view, "[g]aming outside Indian lands cannot be *authorized* by IGRA, but it may be *addressed* in a compact." Gov't Resp. Br. 2. Thus, the Secretary mainly disputes the minor premise of West Flagler's argument by contending that while the Compact here "discussed" online sports betting off of tribal lands, it did not "authorize" it. And whether or not that gaming is authorized or permissible as a matter of Florida state law falls outside the scope of the Secretary's review. Thus, the logic goes, she had no obligation to disapprove the Compact.

We agree with the Secretary. For our purposes, IGRA's complex regulatory scheme contains two important, related principles. First, IGRA abrogated tribal sovereign immunity for certain gaming activity on Indian lands, and it regulates gaming activity on Indian lands, but "nowhere else." *Bay Mills*, 572 U.S. at 795. This is the core teaching of *Bay Mills*, in which the Supreme Court stated in no uncertain terms:

"Everything—literally everything—in IGRA affords tools (for either state or federal officials) to regulate gaming on Indian lands, and nowhere else." *Id.* Put another way, IGRA generally does not restrict or regulate tribal, or any other, activity outside of Indian lands.

Second, while the function of a class III gaming compact is to authorize gaming on Indian lands, it "may include provisions relating to" a litany of other topics. 25 U.S.C. § 2710(d)(3)(C). These include, among other things, "the application of the criminal and civil laws and regulations of the Indian tribe or the State that are directly related to, and necessary for, the licensing and regulation of such activity;" "the allocation of criminal and civil jurisdiction between the State and the Indian tribe necessary for the enforcement of such laws and regulations;" and "any other subjects that are directly related to the operation of gaming activities." *Id.* § 2710(d)(3)(C)(i), (ii), (vii). *Bay Mills* also teaches that such topics can cover state or tribal activity outside of Indian lands. For instance, a state may use a gaming compact to bargain for a waiver of tribal sovereign immunity for a tribe's gaming activity outside of its lands. *See* 572 U.S. at 796–97. And while there are some limits on what a tribe and a state can agree to in an IGRA gaming compact, the purpose of those limits is generally to ensure that states do not use gaming compacts as a backdoor to exercise regulatory power over tribes that they otherwise would not have. That is not a concern in this case.

Following the precept that "a contractual provision should, if possible, be interpreted in such a fashion as to render it lawful rather than unlawful," we find the Compact's text capable of an interpretation in harmony with these two principles. *Papago Tribal Util. Auth. v. FERC*, 723 F.2d 950, 954 (D.C. Cir. 1983); *see also Cole v. Burns Int'l Sec. Servs.*, 105 F.3d 1465, 1485 (D.C. Cir. 1997) ("[A]n interpretation that makes the contract

lawful is preferred to one that renders it unlawful."); 11 WILLISTON ON CONTRACTS § 32:11 (4th ed. May 2023 update) ("Consonant with the principle that all parts of a contract be given effect when possible, an interpretation which renders a contract lawful is preferred over one which renders it unlawful.").  Recall that the key language over which the parties quarrel is in Compact § IV.A, titled "Authorization and Location of Covered Games."  It reads:

> The Tribe and State agree that the Tribe is authorized to operate Covered Games on its Indian lands, as defined in [IGRA.] . . . Subject to limitations set forth herein, wagers on Sports Betting . . . made by players physically located within the State using a mobile or other electronic device shall be deemed to take place exclusively where received at the location of the servers or other devices used to conduct such wagering activity at a Facility on Indian Lands.

J.A. 692; *see also* J.A. 687 (Compact § III.CC.2, containing the same phrasing).

The first sentence of this section simply states that the Tribe is authorized to operate sports betting on its lands.  This is uncontroversial and plainly consistent with IGRA.  Next, the Compact discusses wagers on sports betting "made by players physically located within the State using a mobile or other electronic device," which are "deemed to take place exclusively where received."  The Compact does not say that these wagers are "authorized" by the Compact (or by any other legal authority).  Rather, it simply indicates that the parties to the Compact (*i.e.*, the Tribe and Florida) have agreed that they both consider such activity (*i.e.*, placing those wagers) to occur on tribal lands.  Because the Compact requires all gaming

disputes be resolved in accordance with tribal law, *see* J.A. 702 (Compact § VI.A), this "deeming" provision simply allocates jurisdiction between Florida and the Tribe, as permitted by 25 U.S.C. § 2710(d)(3)(C)(i)–(ii).

The discussion of wagers placed from outside Indian lands is also "directly related to the operation of" the Tribe's sports book, and thus falls within the scope of § 2710(d)(3)(C)(vii). The Compact "authorizes" only the Tribe's activity on its own lands, that is, operating the sports book and receiving wagers. The lawfulness of any other related activity such as the placing of wagers from outside Indian lands, under state law or tribal law, is unaffected by its inclusion as a topic in the Compact.

West Flagler contends that reading subsection (d)(3)(C)(vii)—the "catch-all" provision—in this way violates the canon that Congress does not hide elephants in mouseholes. We disagree. To be sure, as one of our sister circuits recently noted: "As a residual clause, § 2710(d)(3)(C)(vii) takes its meaning from, and is limited by, the rest of § 2710(d)(3)(C)." *Chicken Ranch Rancheria of Me-Wuk Indians v. California*, 42 F.4th 1024, 1036 (9th Cir. 2022) (citing *Yates v. United States*, 574 U.S. 528, 545 (2015)). But at the same time, "as a residual clause, § 2710(d)(3)(C)(vii) is inevitably broader than the more specific topics enumerated in the paragraphs that precede it." *Chicken Ranch*, 42 F.4th at 1036 (internal quotations and alteration omitted); *see also Republic of Iraq v. Beaty*, 556 U.S. 848, 860 (2009) ("[T]he whole value of a generally phrased residual clause . . . is that it serves as a catchall for matters not specifically contemplated—known unknowns[.]"). Indeed, § 2710(d)(3)(C) covers vast ground, including not only the allocation of civil and criminal jurisdiction between a state and a tribe (no small topic), but also state taxation, remedies for breach of contract, and licensing standards. The power of a state to tax Indian tribes for activity on its own lands, or a

tribe's decision to waive its sovereign immunity from suit by a state, *see Bay Mills*, 572 U.S. at 796, are far from "mouseholes." If they are not mouseholes, subsection (d)(3)(C)(vii)—which, as a residual clause, is "inevitably broader"—cannot constitute a mousehole. Thus, gaming activity outside of Indian lands that is directly related to the gaming activity authorized by a compact may appropriately fall within the scope of subsection (d)(3)(C)(vii).

Cases from other circuits interpreting the catch-all provision confirm our understanding. In *Chicken Ranch*, the Ninth Circuit held that provisions relating to family law, environmental law, and tort law—on which California insisted in exchange for permitting the tribe to conduct gaming—could not be the subject of a valid IGRA compact, as they were not directly related to gaming. 42 F.4th at 1037–39. Similarly, the Tenth Circuit has held that subsection (d)(3)(C)(vii) does not permit a compact provision allowing state courts to hear tort suits arising from injuries at Indian casinos. *Navajo Nation v. Dalley*, 896 F.3d 1196, 1218 (10th Cir. 2018). The lesson from these cases is clear and is confirmed by IGRA's legislative history: states cannot use compacts "as a subterfuge for imposing State jurisdiction on tribal lands[,]" *contra* IGRA's purpose. S. Rep. No. 100-466, at 14 (1988). But that is not what happened here.

Nor does *Amador County*, on which West Flagler heavily relies, compel a different result. There, we emphasized that 25 U.S.C. § 2710(d)(8)(A) "authorizes approval only of compacts 'governing gaming on *Indian lands*,' suggesting that disapproval is obligatory where that particular requirement is unsatisfied." 640 F.3d at 381. But in that case, the entirety of the gaming activity discussed in the compact was located on a piece of land known as "the Rancheria," and the dispositive issue was whether the Rancheria constituted Indian lands or

not. In other words, if the Rancheria did not qualify as Indian lands, *no* provision of the compact would seek to authorize gaming on Indian lands, and thus any approval would plainly exceed the scope of the Secretary's authority under subsection (d)(8)(A). In contrast, the Compact here authorizes a substantial amount of gaming on Indian lands separate and apart from online wagers placed from outside the Tribe's lands, including Las Vegas-style gambling and in-person sports betting at the Tribe's casinos. That is sufficient to fulfill the "particular requirement" that the Compact "govern[s] gaming on *Indian lands*." *Id.* At bottom, West Flagler's argument invites the Court to read the extraneous word "only" into the preceding statutory language, and we decline to do so.

Finally, West Flagler protests that the Secretary's argument necessarily creates two types of IGRA approvals: (a) for activity on Indian lands, approval authorizes the activity, while (b) for activity outside of Indian lands, approval has no meaning or legal effect. In West Flagler's view, this is problematic because an approved IGRA compact is an "instrument of federal law" which "preempts state law[,]" but it would be illogical and unworkable for only some parts of an approved compact to preempt state law. West Flagler Br. 24–25. However, this argument misunderstands the purpose and effect of an IGRA approval.

To start, neither of the two out-of-circuit cases that West Flagler cites stand for the novel proposition that an IGRA compact has the force of federal law with preemptive power. One of those cases merely states that IGRA compacts are a "creation of federal law," which is uncontroversial and indisputable given their statutory origin but falls far short of supporting West Flagler's argument. *See Citizen Potawatomi Nation v. Oklahoma*, 881 F.3d 1226, 1239 (10th Cir. 2018). The other cited case simply states that an IGRA compact

confers upon a tribe a "federal right" to conduct gaming on its own lands, for the purposes of establishing federal court jurisdiction over the action—again, indisputable and beside the point. *See Forest Cnty. Potawatomi Cmty. v. Norquist*, 45 F.3d 1079, 1082 (7th Cir. 1995).

In actuality, the approval process exists so that the Secretary may ensure that a compact does not violate certain federal laws, and her approval is a prerequisite for the compact to have legal effect: nothing more, nothing less. Much discussion in the briefs concerns the issue of whether the Tribe and Florida sought to circumvent state constitutional law by including the online sports betting provisions in the Compact. By way of background, in 2018, Florida amended its constitution with a section titled "Voter Control of Gambling in Florida." Fla. Const. art. X, § 30. Under that amendment, "Florida voters shall have the exclusive right to decide whether to authorize casino gambling in the State of Florida[,]" which can only be done through "a vote by citizens' initiative." *Id.* § 30(a). At the same time, the amendment contains an exception for "casino gambling on tribal lands" pursuant to an IGRA compact. *Id.* § 30(c). No voter referendum was ever held regarding online sports betting; therefore, West Flagler argues, the Tribe and Florida would *have* to believe that the IGRA Compact provides the legal basis for that activity.

Whatever the Tribe and Florida—who are not parties to this litigation—may believe, let us be clear: an IGRA compact cannot provide independent legal authority for gaming activity that occurs outside of Indian lands, where that activity would otherwise violate state law. That is in fact the position advanced by the Secretary—who *is* a party to this litigation—and we agree. *See* Oral Arg. Tr. at 6:14–21 (Counsel for the Secretary: "[I]f the state statute . . . related to this action were to be challenged in Florida state court and were to fall, the

compact that they crafted would give no independent authority for the Tribe to continue to receive bets from outside Indian lands.").

Thus, we hold only that the Secretary's decision not to act on the Compact was consistent with IGRA. In reaching this narrow conclusion, we do not give our imprimatur to all of the activity discussed in the Compact. And particularly, for avoidance of doubt, we express no opinion as to whether the Florida statute ratifying the Compact is constitutional under Fla. Const. art. X, § 30. That question and any other related questions of state law are outside the scope of the Secretary's review of the Compact, are outside the scope of our judicial review, and as a prudential matter are best left for Florida's courts to decide.

**B.**

The District Court did not reach West Flagler's Wire Act, UIGEA, and Fifth Amendment challenges to the Compact. But because they have been "fully briefed" and present "purely legal questions[,]" we may decide them. *Assoc. of Am. R.R.s v. U.S. Dep't of Transp.*, 821 F.3d 19, 26 (D.C. Cir. 2016); *see also Consumer Energy Council v. FERC*, 673 F.2d 425, 440 (D.C. Cir. 1982). We conclude that these other challenges lack merit as matter of law.

First, we address the justiciability of these claims. IGRA enumerates a limited number of grounds for which a Secretary "may disapprove a compact[,]" including where the compact violates federal law. 25 U.S.C. § 2710(d)(8)(B)(ii). But where, as here, a compact goes into effect due to the Secretary's inaction, IGRA states that the compact is "approved . . . but only to the extent the compact is consistent with the provisions of this chapter." *Id.* § 2710(d)(8)(C). Because subsection (B) uses "may" rather than "shall," while subsection (C) lists

inconsistency with IGRA as the only ground for nullifying a compact considered approved following secretarial inaction, there is a threshold question whether non-IGRA challenges to a compact in these circumstances are judicially reviewable. Dicta from our opinion in *Amador County* strongly suggests that they are, but we have not definitively resolved the question, because the claim in that case was that the compact violated IGRA, not a different federal law. 640 F.3d at 380–83. But we need not resolve that thorny question here, because even assuming that such claims are justiciable, we find that West Flagler's particular challenges fail as a matter of law.

**1.**

First, West Flagler claims that the Compact authorizes transactions that would violate the federal Wire Act. The Wire Act prohibits anyone "engaged in the business of betting or wagering" from "knowingly us[ing] a wire communication facility for the transmission in interstate or foreign commerce of bets or wagers . . . on any sporting event or contest[.]" 18 U.S.C. § 1084(a). The Act has a safe harbor provision for bets placed to and from states or foreign countries where sports betting is lawful. *Id.* § 1084(b). Violating the Wire Act is a crime punishable by fine or imprisonment. *Id.* § 1084(a).

West Flagler contends that "[o]nline communications are almost invariably routed between servers in and out of state between their origin and destination[,]" and therefore any "realistic implementation of the Compact would require use of wire facilities operating in 'interstate and foreign commerce.'" West Flagler Br. 36. They further argue that the safe harbor provision does not apply, because Indian lands are neither a state nor a foreign country within the meaning of § 1084(b). *Id.* at 36 n.17.

There are several problems with this line of reasoning. As discussed above, the Compact does not itself independently "authorize" wagers placed by patrons located outside Indian lands. That itself forecloses the Wire Act challenge (and the other claims that follow). And even if the Compact did, no matter the scope of our judicial review, IGRA does not require the Secretary to disapprove a compact based on hypothetical violations of federal criminal law that turn on how the Compact is implemented as well as the *mens rea* of the would-be bettors.

In fact, the Compact contains express language that the Tribe "shall ensure" that its sports book operates in "strict compliance" with the Wire Act. J.A. 707 (Compact § VII.A.1(c)). West Flagler does not contest that it would be technically possible for the Tribe to do so. Moreover, the Wire Act is a criminal statute requiring the government to prove *mens rea* in individual circumstances, a principle at odds with the argument that the Compact as a general matter violates the Act, or that the Secretary was required to disapprove it on that basis. Finally, taking West Flagler's argument to its logical end shows why such a challenge cannot be sustained. Under their view, even online betting by patrons who *are* physically located on Indian lands would violate the Wire Act, because some of those bets may be routed off of Indian lands into a state, and then back. There is no support for the novel and sweeping argument that the Wire Act poses such a broad obstacle to an Indian tribe's ability to offer online gambling on its own lands.

**2.**

In a related vein, West Flagler claims that the Compact violates the UIGEA. That Act prohibits "knowingly accept[ing]" certain forms of payment in connection with "unlawful Internet gambling" such as credit card transactions,

checks, and electronic fund transfers. 31 U.S.C. § 5363. This claim suffers from a similar flaw as the Wire Act claim. Even without defining the precise contours of the scope of our review in this case, our review is of the Secretary's decision not to act when presented with the Compact, not whether all hypothetical implementations of the Compact are lawful under all federal statutes. How the Tribe and Florida ultimately implement the Compact in practice, and whether that implementation is consistent with UIGEA, may be the subject of a future lawsuit, but the Compact does not as a facial matter violate the UIGEA. The Secretary was therefore not required to disapprove the Compact on that basis.

**3.**

Lastly, West Flagler argues that the Secretary's approval violates the Fifth Amendment's equal protection guarantee because the Compact impermissibly grants the Tribe a statewide monopoly over online sports betting. But even if the Secretary's approval "authorized" all of the activity in the Compact (as we have explained *supra*, it does not), it would survive rational basis review, which is the applicable level of scrutiny here.

We have held that "promoting the economic development of federally recognized Indian tribes (and thus their members)," if "rationally related to a legitimate legislative purpose[,]" is constitutional. *Am. Fed'n of Gov't Emps., AFL-CIO v. United States*, 330 F.3d 513, 522–23 (D.C. Cir. 2003); *see Morton v. Mancari*, 417 U.S. 535, 554 (1974) (upholding a preference for members of Indian tribes where "reasonably and directly related to a legitimate, nonracially based goal"). The exclusivity provisions in the Compact plainly promote the economic development of the Seminole Tribe. They are also rationally related to the legitimate legislative purposes laid out

in IGRA by "ensur[ing] that the Indian tribe is the primary beneficiary of the gaming operation[.]" 25 U.S.C. § 2702(2). Thus, West Flagler's equal protection challenge fails as a matter of law.

**III.**

Having determined that West Flagler's challenges to the Compact lack merit and judgment for the Secretary is warranted, we are left to decide the Tribe's motion to intervene. The Tribe moved to intervene as of right under Rule 24(a), for the limited purpose of filing a motion to dismiss under Rule 19. In short, a party seeking dismissal under Rule 19 must show that it is a required party that cannot be joined, and without whom the litigation cannot proceed.

Formally, "Rule 19 analysis has two steps." *De Csepel v. Republic of Hungary*, 27 F.4th 736, 746 (D.C. Cir. 2022). "We first determine whether an absent party is 'required'" under Rule 19(a). *Id.* Relevant here, a party is required where it "claims an interest relating to the subject of the action and . . . disposing of the action in the person's absence may . . . as a *practical* matter impair or impede the person's ability to protect the interest[.]" FED. R. CIV. P. 19(a)(1)(B)(i) (emphasis added). If a party is required but cannot be joined (for instance, due to its sovereign immunity), the court must next determine "whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed." FED. R. CIV. P. 19(b). Courts refer to step two of this analysis as determining whether the party is "indispensable." *De Csepel*, 27 F.4th at 748. In doing so, a court considers four factors: (1) whether "a judgment rendered in the person's absence might prejudice that person or the existing parties[,]" (2) whether such prejudice can be "lessened or avoided[,]" (3) "whether a judgment rendered in the person's absence would

be adequate[,]" and (4) "whether the plaintiff would have an adequate remedy if the action were dismissed for nonjoinder." FED. R. CIV. P. 19(b). The Rule 19 inquiry is equitable and discretionary. *See Kickapoo Tribe of Indians v. Babbitt*, 43 F.3d 1491, 1495 (D.C. Cir. 1995); *De Csepel*, 27 F.4th at 747.

The District Court first concluded that the Tribe's proposed Rule 19 motion to dismiss lacked merit. It then denied the Rule 24 motion to intervene as moot. Because the Tribe will suffer minimal to no prejudice in light of this Court's ruling on the merits, we affirm the denial of the motion to intervene on alternate grounds.

Ordinarily, a court decides a prospective party's motion to intervene before summary judgment. The District Court's analysis proceeded in that sequence, though it decided both motions in the same order, and both are presented in this appeal. Our decision to resolve the merits of the case before deciding the Tribe's motion to intervene in *this* instance heeds the well-settled principle that Rule 19 "calls for a pragmatic decision based on practical considerations in the context of particular litigation." *Kickapoo Tribe*, 43 F.3d at 1495; *cf. Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 577–78 (1999) (a court may resolve a case by concluding that it lacks personal jurisdiction before confirming its subject-matter jurisdiction where the former presents an easier question, even though the latter delineates more foundational limits on a federal court's Article III power to decide a case). As the Advisory Committee Notes to the Federal Rules state, the Rule 19 inquiry is meant, above all, to be "practical," and courts should ask: "Would the absentee be adversely affected in a practical sense, and if so, would the prejudice be immediate and serious, or remote and minor?" FED. R. CIV. P. 19 advisory committee's note to 1966 amendment; *see also* 7 CHARLES A. WRIGHT & ARTHUR R. MILLER, FED. PRAC. & PROC. CIV. § 1608 (3d ed. Apr. 2023

update) ("[C]ourts must look to the practical likelihood of prejudice . . . rather than the theoretical possibility that [it] may occur."). This principle underlies the rule itself and is the reason a case may proceed when a non-party's interests are adequately represented by a party.

Here, there is little practical difference between a Rule 19 dismissal on the one hand, and a judgment for the Secretary on the other. Both would keep intact the 2021 Compact, the relief that the Tribe ultimately seeks. In fact, the Tribe did not shy away from expressing its views on the merits of this case; it filed an *amicus* brief explaining the reasons it believes the District Court erred in vacating the Compact, separate and apart from the denial of its motion to intervene. While the ability to file an *amicus* brief is never *per se* "enough to eliminate prejudice," *Wichita & Affiliated Tribes v. Hodel*, 788 F.2d 765, 775 (D.C. Cir. 1986), the Tribe's brief lessens whatever prejudice it would suffer from having this issue resolved favorably in its absence. In reaching this conclusion, we do not discount or take lightly the Tribe's "substantial interest" in its sovereign immunity, *see Republic of Philippines v. Pimentel*, 553 U.S. 851, 868–69 (2008), but we ultimately find that any infringement on that immunity is "remote" and "theoretical" in these unique circumstances. Because Rule 19's guiding "philosophy . . . is to avoid dismissal whenever possible[,]" we find that the practical benefits of deciding this case on the merits outweighs any prejudice to the Tribe. 7 CHARLES A. WRIGHT & ARTHUR R. MILLER, FED. PRAC. & PROC. CIV. § 1604 (3d ed. Apr. 2023 update).

\*   \*   \*

For these reasons, we vacate the opinion below, and the District Court is directed to enter judgment for the Secretary. We affirm the denial of the Tribe's motion to intervene.

24

*It is so ordered.*